**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____x

EMEL MCDOWELL,

                    PLAINTIFF,                      23-Civ _____

        -against-

THE CITY OF NEW YORK,
DETECTIVE CHRISTOPHER SPOTO, Individually        COMPLAINT
and in his Capacity as a New York City Police Officer
DETECTIVE H. FISCH, Individually               **JURY DEMAND**
and in his Capacity as a New York City Police
LIEUTENANT FRED FALCONE, Individually
and in his Capacity as a New York City Police Officer
JOHN DOE POLICE OFFICERS
1-3.

                   DEFENDANTS.

_____x

      PLAINTIFF EMEL MCDOWELL ("PLAINTIFF"), by and through his attorneys, the

law firm of CUOMO, LLC. states as follows upon information and belief based upon the files

maintained in our offices:

<u>**NATURE OF ACTION**</u>

1.     This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and New York law, seeking

monetary damages for PLAINTIFF, EMEL MCDOWELL, due to his wrongful arrest, prosecution,

conviction, and 19 years and 2-month imprisonment of a 22 year to Life sentence, caused by the

pervasive misconduct of the members of the New York City Police Department (hereafter NYPD)

and members of the Kings County District Attorney's Office (hereafter KCDA).

2.     PLAINTIFF'S conviction by jury in 1992 was initially overturned on December14, 2009,

by Hon. John G. Ingram. At a CPL § 440 hearing, held on that date, however, PLAINTIFF was

coerced and compelled to plead guilty to manslaughter as detailed below.

3.     In 2019, based upon a petition from PLAINTIFF'S counsel, the KCDA's conviction review

unit agreed to reinvestigate PLAINTIFF'S case and in 2022, after multiple witnesses were

interviewed; crime scene photos revisited; and a confession was obtained from the real killer;

PLAINTIFF'S conviction was reversed, vacated, and the indictment dismissed.

4.      On March 16, 2023, counsel for Plaintiff filed a motion pursuant to *CPL§ 440.10(1) (g)* and (h) to vacate his conviction for the murder of Jonathan Powell on the grounds of newly discovered evidence and actual innocence.

5.      On March 16, 2023, the KCDA joined in PLAINTIFF'S application to vacate his conviction and dismiss the indictment against him on the same grounds.

6.       On March 16, 2023, Kings County Supreme Court Judge Hon. Matthew D'Emic, granted KCDA's motion in its entirety. A copy of the decision is attached as Exhibit "A."

7.      This action now seeks to hold the Defendants CITY OF NEW YORK (hereafter "City") DETECTIVE C. SPOTO (hereafter "SPOTO"),  DETECTIVE H. FISCH (hereafter ("FISCH"), AND LIEUTENANT FRED. FALCONE (hereafter "FALCONE"), liable for the misconduct that brought about the PLAINTIFF'S conviction in violation of federal civil rights statute, *42 USC § 1983* and *Monell v. Dept. of Social Services, 436 US 658 (1978).* The unlawful actions of the police and prosecutors that is documented in this action resulted from affirmative or de facto municipal policies, practices, and customs to violate the constitutional rights of criminal suspects and defendants, or from a deliberate indifference by policy making officials, acting on behalf of the City Of New York.

8.      As to the City of New York, in 1990-1993 both NYPD and KCDA, as a matter of policy and custom, coerced witnesses to give false or unreliable testimony through their powers of arrest and interrogation, misused Damiani or takeout orders, unlawfully concealed exculpatory or impeachment material known as "Brady/Giglio" material, and lied to or mislead courts, defense attorneys, and others to cover up their unlawful behavior, See e.g. *The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the New York City Police Department* (establishing that police officers use of false evidence and perjury were "endemic" in the NYPD during 1990-1993),  and  prosecutors from KCDA condoned the police conduct and withheld *Brady* material  and used false evidence when PLAINTIFF was arrested, prosecuted and convicted*; see also Kings County District Attorney's Office, 426 Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York, July 9, 2020,  p. 14* (KCDA admitting that between 1990-1993, the use of false evidence and suppression of Brady material were institutional failures of the KCDA administration, and  resulted in scores of wrongful convictions).  Current DA Eric Gonzalez acknowledged that 83% of the 25 wrongful convictions detailed in that report were caused by prosecutorial misconduct.

9.      In cases where such misconduct was exposed, NYPD and KCDA policymakers failed to meaningfully investigate the conduct or whitewashed it, took no disciplinary action against the offending employees, and instead praised and promoted them, thereby encouraging future constitutional violations to occur. Those policymakers were deliberately indifferent to the misconduct despite abundant evidence that NYPD officers and KCDA prosecutors suppressed Brady material and used false or misleading evidence that violated the constitutional rights of defendants.

10.     Additionally, the KCDA under former District Attorney Charles J. Hynes ("hereafter "HYNES"), maintained several affirmative, unconstitutional policies that led the trial prosecutor in PLAINTIFF'S case to conceal Brady material and utilize false evidence, and other prosecutors to continue to cover it up after PLAINTIFF was convicted.

11.     As established by KCDA internal records and sworn testimony from several KCDA prosecutors, the Hynes administration would, as a matter of policy:

a)   Withhold prosecution witnesses' pretrial recantation if prosecutors disbelieved, or at least claimed to have disbelieve, the recantations, which is a blatant violation of the *Brady* rule which requires any objectively favorable information to be disclosed to the defense.[1] See Deposition of Theresa *Corrigan in Zahery v, City of New York, 98 CV 4546 (LTS)* (testifying to the longstanding KCDA pretrial recantation policy);

b)   Improperly obtain and abuse Damiani orders to coerce defenseless inmates into testifying against criminal defendants by;

c)   Submit affirmations to the court purporting to have been affirmed and signed by prosecutors but which, in truth, were signed by paralegals in the office;

d)   Falsely represent in affirmations that the inmates asked to speak to the KCDA when, in truth, they had not, and the prosecutors were unilaterally having them produced to the KCDA to interrogate them;

e)   Representing to the court that the inmates would not be produced to the KCDA unless they consented in writing, but failing to honor that promise or ensure that the inmates consented to their production, and produce those inmates against their will and without their consent, and

---

[1] *See e.g. Strickler v. Greene, 5*27 U.S. 263, 282 n. 21 (1999) ("Our cases make clear that *Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness.")*; People v. Robinson,* 133 A.D.2d 859,860 (2d Dept. 1987) ("Even if the prosecution had valid reasons to consider this witness to be unreliable, it should nonetheless have provided the defense with (the witness' statement, which was clearly *Brady* material.")

f)  Suppressed all of this from the defendants whom these coerced inmates testified against;[2]

g)  Intentionally limit KCDA's search for records responsive to defendants' post-conviction FOIL requests for Brady material to the defendants' trial files, even though the KCDA maintained Brady material in several other files within the office (e.g., Detective-Investigator's Squad, Victim's Services Unit, Witness Relocation Unit, and Fiscal Office). See Deposition of KCDA ADA Morgan J. *Dennehy in Collins v. City of New York, 11 CV 766 (FB) (RML), pp. 44-45, 56, 107* (admitting to the existence of this policy at the time PLAINTIFF made his FOIL requests to the KCDA. This practice was declared illegal around the time that the KCDA used it to deny PLAINTIFF' post-conviction FOIL requests for Brady material. See *Collins v. Hynes, Kings Co. Index No. 22973/96*, Decision and Order, Jan. 22, 1997, p. 8 (Dowd, J.) (District Attorney's search for records requested under the FOIL "shall be not limited to respondent's case file in the underlying criminal case, but to any record in the District Attorney's possession; the statute "does not limit searches to case files" but "to records kept by the agency."); and

h)  Summarily deny defendants' post-conviction FOIL requests for Brady material whenever the KCDA did not find documents specifically labeled "Brady material" in defendants files, even though the content of the records was Brady material, and Brady material was held outside of defendants' trial files. See Deposition of Morgan J. Dennehy, above, at pp. 59, 93-94, 127-29 (admitting to this practice).

12. PLAINTIFF will demonstrate that both NYPD and KCDA, as a matter of policy, secretly encouraged witnesses to provide false or unreliable testimony, unlawfully concealed exculpatory or impeachment evidence known as Brady Material, and lied to or misled courts, defense attorneys, and criminal defendants to cover up their unlawful behavior. In the rare case that such misconduct was exposed, these agencies took no disciplinary action against the offending employees, but instead praised and promoted them, thereby

---

[2] See Senior Homicide Prosecutor Stan Irvin's *CPL § 440.10* Hearing Testimony in *People v. Tasker Spruill,* Ind. No. 13008/95, July 27 and November 2, 2016 (admitting to this *Damiani* practice); KCDA's Appellant's Brief in Spruill, 24, *26*-27 (KCDA admitting to the affirmation practice); Transcript of Oral Argument in *People v. Spruill,* Ind. No.13008/95, July 13, 2016, p. 27 (KCDA taking the position that in the 1990s it was permissible to use court orders to browbeat" recalcitrant inmate witnesses into meeting with prosecutors, after it was revealed that a homicide prosecutor involuntarily produced a witness to the KCDA seven times, an inmate tried to kill himself to avoid one of those forced productions).

encouraging future constitutional violations to occur, including directed against the PLAINTIFF.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

13.    This action arises under *42 U.S.C. §§ 1983* and *1988*, and under the common law of the State of New York.

14.    Jurisdiction is conferred on this Court by *28 U.S.C. §§ 1331* and *1343*, and by principles of pendent jurisdiction.

15.    Venue is proper in this Court pursuant to *28 U.S.C. § 1391*.

16.    On or about April 26, 2023, PLAINTIFF served upon Defendant, City of New York timely notice of the present claims pursuant to New York *General Municipal Law § 50-e*. A hearing pursuant to New York *General Municipal Law § 50-h* was held on August 3, 2023. The claim has not been adjusted or paid though more than thirty days have elapsed since service of the notice of claim.

17.    This action commenced within one year and ninety days of the accrual of PLAINTIFF'S cause of action.

18.    PLAINTIFF has duly complied with all condition's precedent to the commencement of this action.

## THE PARTIES

19.    PLAINTIFF, EMEL MCDOWELL, is a citizen and resident of the State of New York and of the United States and resides within the Eastern District of New York.

20.    Defendant, CITY OF NEW YORK, of which County of Kings is a subdivision, is a municipal corporation of the State of New York with regulatory powers and duties and is situation in the Eastern District of New York.

21.    Defendant, CHRISTOPHER SPOTO, at all relevant times, was a police detective for the New York City Police Department, was employed by the City of New York, acted toward PLAINTIFF under the color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

22.    Defendant, H. FISCH, at all relevant times, was a police detective for the New York City Police Department, was employed by the City of New York, acted toward PLAINTIFF under the color of statutes, ordinances, customs, and usage of the State of New York and the City of New

York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

23.     Defendant, F. FALCONE, at all relevant times, was a police lieutenant for the New York City Police Department, was employed by the City of New York, the immediate supervisor of defendants SPOTO and FISCH and acted toward PLAINTIFF under the color of statutes, ordinances, customs, and usage of the State of New York and the City of New York and acted within the scope of his employment. He is sued in his individual and his official capacities.

24.     Defendants, John Doe, at all relevant times, were members of service for the New York City Police Department, was employed by the City of New York, acted toward PLAINTIFF under the color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment.  They are sued in their individual and official capacities.

## JURY DEMAND

25.     PLAINTIFF hereby demands trial by jury of all issues raised in this complaint.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Crime and Initial Investigation

26.     On October 27, 1990, just after midnight, Johnathan Powell, (hereafter "Powell"), was shot and killed, by an individual shooter who fired a single shot into Powell's chest at a sweet 16 party. The shooting occurred outside of the community center at 671 Gates Avenue, Brooklyn, New York, near the rear side of the community on the walkway/ramp leading to the tunnel to leave the center's courtyard. Immediately preceding Powell's shooting, Powell and several of his friends had been involved in an altercation with Troy Couturier (hereafter "Courtier") inside of the community center, which left Courtier on the community center floor battered and bloodied.

27.     During the party Courtier allegedly randomly walked up to "Wayne[3] "and began mushing him, then turned his attention to Divine Thomas (hereafter "Thomas"). Thomas left the party, went to his home, and asked his cousin, Powell, to come to the party to attack Courtier.

28.     When Powell arrived at the party, Thomas pointed out Courtier and Powell and his friends began to punch, stomp and kick Courtier.

---

[3] Despite "Wayne" being a friend of Thomas, Danny Blackmen and Powell's, who was described as "a lil boy," he was never found or interviewed, if he existed at all and was present at the party.

29.     Security at the sweet 16 venue escorted Powell and his friends out of the community center first and was attempting to slowly release other party attendants. While Powell and his friends continued to yell death threats to Courtier and the "boy who was with him," from the courtyard.

30.     As Baron Blount (hereafter "Blount), who was with Courtier when he was beaten, attempted to leave, Po. l and friends yelled threats at Blount as he walked up the ramp to exit the courtyard, Blount approached to leave, Powell and his friends continued their threats as Blount attempted to exit the courtyard area, Blount shot Powell once in the right side of his chest and fled.

31.     In 2022, Blount confessed to KCDA investigators that he and not Plaintiff, shot Powell on October 27, 1990.

32.     Courtier was released from the community center in a later group and immediately shot in the leg by" one of Powell's friends," upon exiting the community center.

33.     After Powell's shooting, Thomas and his friends were under immense pressure from his grandmother, Powell's mother, and Thomas' stepfather, Joseph Callendar, who was then a New York City Corrections Officer, to identify the person who had shot Powell, being that Thomas had gone to his home to get Powell and he wound up dead less than thirty minutes after leaving his home.

34.     NYPD was also under immense pressure to make arrests and close murder cases during a period of record high murders in New York City.

35.     On September 2, 1990, the killing of Brian Watkins, a 22-year-old Mormon tourist from Utah, which is considered the "tipping point" in New York's history of violence and mayhem, had occurred which prompted the infamous front-page headline aimed at former Mayor David Dinkins, "Dave, Do Something!" beneath that screaming, full-page plea were headlines from three different columns: "It's Time to Take Off the White Gloves" by former mayor Ed Koch, "We Are Captives in Our Own Homes" by columnist Ray Kerrison and "New York's Streets Are Awash in Blood," by Jerry Nachman, [4] and resulted in the wrongful arrest, prosecution, and conviction of Johnnie Hincapie, in the Watkins case.

36.     On October 27, 1990, just after 12:00 am when Powell was murdered and Courtier was shot, Detective's SPOTO and FISCH began interviewing several witnesses and continued to work

---

[4]Hughes, Brian, The Murder That Changed New York City, City Limits. October 26, 2010, https://citylimits.org/2010/10/26/the-murder-that-changed-new-york-city/,

as a collective throughout the investigation. The Detectives alternated and collectively visited the crime scene, interviewed witnesses, spoke with PLAINTIFF, and conducted the line-up together with their supervisor FALCONE reviewing statements and attending the lineup.

37.     On the evening of October 27, 1990, minutes before the line-up was underway, SPOTO told PLAINTIFF that, each time that he's picked by someone in the line-up, that SPOTO would come and give PLAINTIFF a "thumbs down and each time that PLAINTIFF was not picked SPOTO would come and give PLAINTIFF a thumbs up."

38.     Thomas, who had been unable to physically describe the shooter because the shooter wore a hood covering his face and did not know the shooter from any previous encounters. At the line up on October 27, 1990, originally selected numbers 4, which was PLAINTIFF who is dark complexioned, or 5, which was a much lighter complexioned filler, "he wasn't sure." [5]

39.     SPOTO entered the lineup room and gave PLAINTIFF a thumbs up.

40.     Raheem Graham (hereafter R. Graham), a close family friend of Powell and Thomas, provided a physical description of a shooter who was 5' 9", wearing a red jacket with a black stripe on it and a red hooded sweatshirt, which covered the shooter's face. At the line up on October 27, 1990, viewed the lineup and stated that he could not identify anyone because of a hood worn by the shooter that covered his face.

41.     SPOTO entered the lineup room and gave PLAINTIFF a thumbs up.

42.     On October 27, 1990, at 11:50 a.m., Danny Blackmen (hereafter "Blackman") informed SPOTO that "some boys" just walked up during the party and began "mushing Wayne," then turned their attention to "mushing Thomas," at which point¸ Powell's cousin, Duwan Moore, broke the fight up, and had a conversation with Thomas to calm Thomas down. After the conversation with Duwan Moore, Thomas left to get Powell. Upon Powell's arrival, he immediately attacked Courtier. Blackmen went on to say that Blackmen, the boys ran outside, Powell pursued and said "Emel I got to ask you a question," and Emel pulled out a gun, pointed it at Thomas, Powell stepped in front of the gun, Emel fired, Powell stumbled and chased the shooter and collapsed under the tunnel.

43.     Before Blackmen was shown a line-up by the Detectives, SPOTO and FISCH were aware that Duwan Moore was not present until *after the shooting*, Blackmen never saw the face of any

---

[5] According to the line-up receipts, all three witnesses viewed the line-up between 1730 and 1740 hours on October 27,1990, no order is given.

shooter and could not have witnessed Powell's shooting on the rear side of the community center building from the community center doorway that was in the front of the building[6]. Despite this Blackmen was shown the line-up without further inquiry.

44.     SPOTO came in and gave PLAINTIFF a thumbs down.

45.     On October 27, 1990, at 2:00 pm, Blackmen had been interviewed by KCDA Erica Perel with both SPOTO and FISCH present. In this version of events Blackmen again placed Duwan Moore in the community center and actively involved in mediating before, during and after the fight and shooting.

46.     In the same interview, Blackmen explained to SPOTO, FISCH and the KCDA, the location where Powell was shot in the courtyard. "there's trees and some bushes there and it's like a little piece that you got to step in to get out there, Powell stumbled over that and said hold up, started chasing his shooter… when he got to the tunnel he collapsed."

47.     SPOTO and FISCH had visited the crime scene at various times on October 27, 1990, prior to the line-up and was well aware that on the walkway to the only doorway of the community center, which is in the front of the building, there were no trees, bushes or other greenery, and no "stoop, "only concrete walls and fully concrete ground.  The only greenery was along the side wall of the community center which leads to the courtyard, and the only "stoop" was on the side of the community just past the back of the center. SPOTO and FISCH was also aware that the community center walkway in the front of the community center was 40-50' long and that the "ramp" to the tunnel to exit the courtyard that runs along the side of the community center and connects to the exit tunnel, was another 45-50' long upward incline.

48.     SPOTO and FISCH were both aware that Powell had suffered a gunshot wound that pierced the upper lube of his right lung,  the right atrium of the heart, the ventricle of the heart and the lower lobe of the lung could not run the 80' or more, half of that being up an incline, to collapse "under the tunnel," where Powell's body was found.

49.     During the same interview Blackmen also claimed to have been outside to watch the shooting, while at the same time informing SPOTO, FISCH and KCDA that "some little boy ran *in the party* and said that "Powell got shoot. Powell got shot and a lot of boys from around the

---

[6] On October 27, 1990, at 11:40 am, FISCH. interviewed Shamik Graham, brother of Raheem Graham, and was informed that "I heard shots from the *rear* of the community center." This information is consistent with the shooting location given by Blackmen.

neighborhood *ran outside*." Blackmen could not have been inside to hear what the "lil boy" said and outside witnessing the shooting on the side of the community center and seeing Powell collapse under the tunnel at the same time.

50.     Blackmen claimed to have known "Emel from JHS 258, which Emel never attended, and in the neighborhood." Did not physically describe the shooter but informed the police that the shooter's name is "Emel."   At the line-up Blackmen allegedly identify number 4, which was Plaintiff. Blackmen also identified Powell family member, Duwan Moore, as being present during the initial altercation, having broken it up, having a conversation with Divine Thomas, and later breaking up the Powell and friends versus Courtier fight and having a conversation with Powell. SPOTO and FISCH knew that Duwan Moore came to the scene for the first time, after hearing gunshots and learned that Powell was shot. Duwan Moore had told them this on October 27, 1990, at 1:10 am while at Kings County Hospital and Thomas confirmed it.

51.     The materially  self-conflicting versions of events that Blackmen provided on October 27, 1990, is , yet again,  materially different from the version that he would later relay to the grand jury, two weeks after the shooting, discussed further below, where Blackmen did not see a face, but was behind the shooter with a hood covering his face, only saw a pop, did not see a gun,  heard a flash, and witnessed one of the alleged gunmen wearing a jacket similar to one he'd seen "Emel " wearing earlier that night in the party.

52.     It was after SPOTO was left with Blackmen, whom he knew did not actually see the shooting and who provided a narrative that was not physically or medically possible, did SPOTO later, inform the PLAINTIFF that there were now two positive I.D.'s, the second guy had come back after his initial line up viewing and said that he's sure that it's number 4 without even a second look at the line up participants.  Thomas did not need a second look, because Spoto had, "told Divine which position," Emel was at. See ¶¶ 135-136 (Second Thomas Line Up Receipt released for the first time after PLAINTIFF'S conviction).

53.     On October 27, 1990, Blount was interviewed at his home, and informed Police that he was at the party, two guys jumped Courtier, everybody went outside, he ran around the corner, and he saw an ambulance, which SPOTO, FISCH and KCDA did not believe, since they noted Blount

as a possible "EW" or eyewitness on their witness summary sheet obtained by PLAINTIFF through FOIL, years after his trial.[7]

54.    On October 27, 1990, at 6:50 pm FISCH interviewed Tikia Jordan who informed SPOTO that she'd heard that a guy name Baron had shot Powell.

55.    On October 27, 1990, Lawrence Lackey was interviewed by SPOTO and was informed the Detective that he had saw a bunch of guys beating Troy Courtier, everybody ran outside, Powell was outside taking off his jacket as if he was ready to fight, then someone shot him.  That he was standing near Emel and his girlfriend, Emel did not shoot him.

**The Crime and Initial Investigation**

53.    On October 27, 1990, at approximately 3:00 am, The NYPD Forensic Unit took seven crime scene photos of the community center and courtyard area, PLAINTIFF and his attorneys would not know that these photos existed until almost 5 years after PLAINTIFF was convicted at trial.  The crime scene unit also retrieved blood samples from the community center that were never tested, and prepared diagrams of the community center and courtyard areas, which the PLAINTIFF and his attorneys also would not see until 5 years after PLAINTIFF'S conviction at trial.

54.    The Crime Scene Photos affirmed what Blackmen had described and the fact that he could not have witnessed any part of the shooting from the community center doorway, since the shooting undisputedly had occurred on the  rear side of the community center in the courtyard, where the "trees and some bushes there and it's like a little piece that you got to step in to get out there, and tunnel," which both prosecution witnesses described as the location of the shooting and Shamik Graham confirmed when he informed SPOTO and FISCH that the shots were "from the back of the community center."

55.    On October 27, 1990, SPOTO visited PLAINTIFF'S home and left a message asking that PLAINTIFF call the precinct as soon as he gets home.  PLAINTIFF'S mother immediately called and instructed that PLAINTIFF come home and call the Detectives. PLAINTIFF immediately went

---

[7] Blount's October 27, 1990, was not believed by the Defendants because in the Defendant's witness list summary, prepared by GINSBURG, and obtained by PLAINTIFF through a post-trial FOIL request the Defendant's listed "Baron Blount, possible EW, friend of D?"

to his home, called SPOTO, and was asked to come to the 79th precinct. PLAINTIFF was at the precinct within ten minutes with his mother.

56.     Upon arriving at the precinct, SPOTO asked PLAINTIFF was he at the party, PLAINTIFF answered yes. SPOTO asked PLAINTIFF did he know who had shot Courtier and PLAINTIFF responded that he did not but had heard that it was one of Powell's friends.  SPOTO asked PLAINTIFF if he knew who shot Powell, PLAINTIFF said that he had heard after the fact that Powell and his friends had jumped Courtier and were threatening to shoot Courtier and Blount, so Blount had shot Powell.  SPOTO asked PLAINTIFF what jacket he had worn the night before, PLAINTIFF informed that he had worn the jacket that he was wearing while sitting in the 79th precinct.  SPOTO said that people were saying that the PLAINTIFF had killed Powell and asked if PLAINTIFF was willing to give him his jacket for gunpowder testing, PLAINTIFF took his jacket off and voluntarily gave it to SPOTO who accepted it.

57.     The jacket worn by the PLAINTIFF on October 27, 1990, was a New York Giants Team Varsity Jacket that was powder blue, with white leather sleeves with an almost one-foot New York Giants Helmet logo across that back.

58.     After the initial conversations with SPOTO, FISCH came into the room with SPOTO and PLAINTIFF and explained that PLAINTIFF was in big trouble, and he wanted to help PLAINTIFF but could not unless PLAINTIFF told the truth.  PLAINTIFF repeated everything that he had previously informed SPOTO. FISCH asked PLAINTIFF if he would agree to have his hands wiped for gunpower residue, PLAINTIFF agreed and encouraged the detectives to do so.

59.     After the previously mentioned line up was conducted, SPOTO and FISCH informed PLAINTIFF that he was being arrested for the murder of Powell, PLAINTIFF was read his rights and asked if PLAINTIFF would be willing to speak with an Assistant District Attorney on video, which PLAINTIFF said he would.

60.     FISCH went to get PLAINTIFF'S mother and informed her that PLAINTIFF was not helping them help him, so he was being arrested.  The Detectives gave PLAINTIFF'S jacket to his mother.  When PLAINTIFF objected saying that the Detectives had informed him that they would test the jacket and his hands.  SPOTO and FISCH explained to PLAINTIFF that they had changed their minds on both evaluating his jacket and his hands and that they would not send PLAINTIFF to Rikers Island with his jacket but would give it to his mother.

61.     Once PLAINTIFF was indicted and began to review the discovery that had been turned over by KCDA, it  was  realized that the shooters jacket was a key piece of identification evidence in this case and since PLAINTIFF'S jacket did not fit any description provided by the witnesses who were going to testify against the PLAINTIFF at this criminal trial,  the jacket was held while the lineup was conducted so that it wouldn't be in the photographs,  was not tested or photographed separately, nor was there any record created by the police that indicated that that was the jacket worn to the precinct on October 27, 1990.  The jacket was given to PLAINTIFF 's mother, because under the facts of the case it exculpated the PLAINTIFF had it been vouchered or photographed.

62.     After PLAINTIFF'S conviction, PLAINTIFF learned that Detectives SPOTO and FISCH had approached this case from a policy position that held, that if the PLAINTIFF, "did not commit the crime, then he probably knew who did since he was friends with Troy Courtier, if he does not give up the person who did it and help make a prosecutable case, then he deserves to be in jail."

63.     SPOTO and FISCH did not follow up on any evidence that indicated that someone other than PLAINTIFF had committed the crime, they worked to suppress this evidence, and simply arrested Plaintiff and made Plaintiff and his defense team resolve the case, which is exactly what happened over the course of 32 years.

64.     SPOTO, FISCH and KCDA, granted Powell family members and associates unwritten immunity and did not pursue any information, nor question any witnesses regarding perpetrators of Courtier's bloody assault and shooting.

 **PLAINTIFF'S Arrest and Indictment.**

65.     SPOTO and FISCH relied upon the statements and identifications of Blackmen and Thomas, which they knew was false or unreliable, to persuade KCDA to authorize the arrest of PLAINTIFF and initiate criminal proceedings against him.

66.     To formally initiate criminal proceedings, SPOTO, under oath, executed and caused to be filed a Criminal Court complaint.

67.     The criminal court complaint signed on October 28, 1990 swears that, SPOTO had been "informed by *a person* known to the New York City Police Department" that PLAINTIFF had shot and killed Powell on October 27, 1990[8], not persons or people, which is consistent with THOMAS not having originally identified the PLAINTIFF at the line-up om October 27, 1990.

---

[8] A criminal complaint must identify the factual basis of the complainant's knowledge and/or information that the defendant committed the offense charged. *CPL § 100.15; People v. Dreyden,*

68.     SPOTO and KCDA knew that Blackmen could not have witnessed the shooting from the location that he'd claimed to have been, that Blackmen's version of Powell having chased his shooter 40-50 feet then up an additional 40-50 foot incline after having both lungs and major components of his heart shot through was   a   medical impossibility, and that Blackmen had misidentified, Duan Moore, whom he'd known for years as having been present and involved before, during and after the altercation, but Moore was not present   until after the shooting.   The SPOTO and the KCDA prosecutor knew that Blackmen's materially varying accounts each time that he was interviewed, was false or at least heavily unreliable account. The assistant district attorney also knew that Blackmen and Thomas created the magical thirteen- or fourteen-year-old 'Wayne' character who had seemed to disappear into thin air after the party.

69.      Blackmen, went on to testify before a Kings County grand jury, under oath that  Emel was not among the boys who originally confronted Divine Thomas, despite his previous statements to police that Emel was involved in the initial incident, that  Courtier  was the individual who had mushed  Thomas, that Blackmen ran to the back of the community center for something while Powell and others had went outside, he returned in time to see Emel, whom now he alleged to have had an argument with years ago, walk outside, he no longer knew Emel from seeing him by Junior High School 258 mostly in the summer, but would see him two or three times a week walking through the neighborhood. Most importantly, he no longer saw 'Emel's face but saw the back of a hooded shooter, saw a flash, heard a pop, but did not see a gun.[9]

70.     SPOTO and KCDA also knew that the second witness,  Thomas, was interviewed and was never able to provide any description of the alleged shooter, had stated  that the shooter wore a hood covering his face, and upon viewing a line-up, identified the shooter as number 4 , a slim, dark complexioned individual or number 5 a heavier built , light brown complexioned individual, he wasn't sure because "he'd only seen a portion of the shooters face because of a hood blocking his face.  Thomas was only able to identify PLAINTIFF as the shooter after SPOTO told Thomas who

---

*15NY3d 100, 104(2009) (*A criminal complaint must state the source or sources of information that is the basis of complainant's knowledge *and* belief that the defendant committed a crime.)

[9] These revelations documented in the grand jury testimony was most likely revealed to both the KCDA and NYPD during the interviews of Blackmen days earlier.  But KCDA 's policy for riding ADA's was not to elicit exculpatory materials from witnesses on record and essentially suppress Brady material. *See KCDA Riding Program Memorandum, Taking States from witnesses.*

to select and created two-line up receipts, the second of which was withheld until after PLAINTIFF'S trial and conviction.[10]

71.    The KCDA and NYPD, showed a deliberate indifference to the truth, never attempted to reinterview Blount even though he was clearly at the scene, was immediately present during the fight and had been implicated as the shooter, nor did they find any of the self-conflicting, material inconsistencies and false statements to be read flags to spark an ongoing investigation.

72.    Once they had PLAINTIFF in their sights as a suspect, this provided an effortless way for them to "close" a murder case in less than 24 hours and maintain the conviction if they obtained one.

73.    Based upon the complaint that relied upon false information, PLAINTIFF was arraigned on a charge of murder in the second degree.   PLAINTIFF was remanded without bail and remained in custody for the next 19 years and 2 months of his life.

74.    In November 1990, PLAINTIFF was indicted by a Kings County Grand Jury accusing him of Murder in the Second Degree, (2 counts), Criminal Possession of a Weapon in the Second Degree and Criminal Possession of a Weapon in the Third Degree, following a false, misleading, and incomplete grand jury presentation.

75.    There were two witnesses, Blackmen and Thomas, who offered incriminating testimony against the PLAINTIFF before the grand jury.[11]

76.    Blackmen, who despite his earlier statements misidentifying Duwan Moore, whom he'd known for years, as having played a role in the altercation. Blackmen no longer testified that he looked in Emel's face, watched him pull out a gun and shoot Powell. Blackmen now testified under oath that he saw, three fully hooded and armed boys from behind, one wearing a jacket like one he'd seen Emel wearing earlier that night, not the New York Giants Varsity that PLAINTIFF had actually worn, did not see a gun, but heard a pop, saw a muzzle flash, and saw Powell jerk.

77.    According to Blackmen's grand jury version of events, he was able to see the guns through the men's backs and identify exactly which one discharged his firearm.

78.    The grand jury was not informed that:

---

[10] The first line up receipt stated that Thomas said that it was "4 or 5" he isn't sure and later came back and said number 4," the second line up receipt said number 4, he shot Powell."

[11] Graham also testified before the grand jury, and did not identify the PLAINTIFF, but his grand jury testimony, audio taped statement, and address was never turned over to the defense at trial and was repeatedly denied through FOIL requests.

(a)  Duwan Moore had been interviewed and explicitly stated that he was not at the party, but was driving from his home around the corner, heard shots, stopped to see what happed and learned that his cousin, Powell, had been shot;

(b)  That Duwan Moore's cousin, Thomas, did not speak to his cousin Duwan Moore in the community center after the original altercation, but left and sought his cousin Powell, which further proves that Mr. Moore was not present;

(c)  The area that Blackmen described as the shooting location was on the side of the Community Center, which made Blackmen's view of the shooting obstructed by the door of the community and the side wall of the building which then made it impossible for him to have witnessed;

(d)  That Blackmen had originally and repeatedly informed the Defendants that Powell pursued the shooter(s) out of the community center which allowed the shooters to face the community center doorway and allegedly see "Emel's" face, watch him pull out a gun and fired the shot that killed Powell, which was the opposite of what he testified to before the grand jury;

(e)  That, the position that Blackmen was located from where Powell's body was found is approximately 80 feet or more with a 40-foot incline, minimum, that Powell would not have been able to run based upon his medical condition after the shooting;

(f)  The prosecution did not provide any crime scene photos or diagrams of the crime scene area that had been generated by the Defendants on October 27, 1990;

(g)  That, despite both Thomas and Blackmen having viewed the line-up together, the original arrest was based upon a single identification, because Thomas had not identified the PLAINTIFF at the line-up.

79.     The second witness, Thomas, had also stated that the shooter had worn a hood.  Thomas claimed to have been the original target of the shooter, despite his claims that Powell assaulted Courtier and he did not participate.  The hood worn by the shooter was the reason why Thomas could not and did not offer any description of the shooter besides that he had a hood on.

80.     The grand jury was not informed that Mr. Thomas could not provide any description of the shooter prior to the line-up.

16

81.    The grand jury also was not informed that during the line-up Thomas had chosen number 4 a slim dark skinned individual and number 5 a stocky built light brown skinned individual, not two dark skinned individuals and that the alleged shooter was identified for him.

82.    The grand jury was not informed that PLAINTIFF had several alibi witnesses who were with him and attested that he did not shoot Powell, nor brandish a gun.

**PLAINTIFF'S Criminal Trial**.

83.    KCDA's, Jeffrey I. GINSBERG (hereafter "GINSBERG",) was assigned to PLAINTIFF'S criminal case from the inception, and  was required, under the United States Constitution and the laws of the United States and the State of New York, to disclose to the defense all evidence and information known to the Brooklyn District Attorney's Office or the New York City Police Department that was favorable to the defense and considered cumulatively, was reasonably likely to affect the outcome of the trial which would be considered Brady material.

84.    Where such information had been specifically requested by the defense, GINSBERG was required under New York law to disclose it if there was any reasonable possibility that it might affect the trial's outcome.

85.    This included (a) information directly tending to establish the defendant's innocence, and (b) information tending to impeach the credibility of significant witnesses called by the prosecution to meet its burden of convincing every juror, beyond a reasonable doubt, that the defendant is guilty.

86.    Such information had to be disclosed in a timely manner, meaning sufficiently in advance of trial to permit the defense to adequately investigate and make use of it.

87.    Such information is required to be disclosed whether it was recorded or just verbal.

88.    In addition, GINSBERG has a Federal Constitutional obligation not to introduce testimony or evidence, or to make argument, that he knew, or should have known, was false, misleading, and to promptly correct and false or misleading evidence or argument that the prosecution preset to the court or jury.

89.    Finally, GINSBERG had an absolute obligation under New York law, at the beginning of the trial to disclose to the defense all recorded statements of the prosecution witness (known as "Rosario Material") relevant to the subject matter of their direct testimony.

90.    Where Rosario material was favorable to the defense and material, it would also be required to be disclosed under Brady.

91.     By law, the defense was legally entitled to rely upon the completeness of GINSBERG'S Brady and Rosario disclosures.

92.     By law, the defense was not required to assume that GINSBERG,[12] as an officer of the court and a law enforcement official, had made an incomplete, false, or misleading disclosure.

93.     GINSBERG never disclosed the audio taped statements of neither Danny Blackmen nor Divine Thomas, but provided a transcript of those statements, where Danny Blackmen is alleged to have identified PLAINTIFF as "Emel Ashward."

94.      All statements of both Blackmen and Thomas were Rosario material under New York State law.

95.     When defense counsel attempted to utilize the transcript for impeachment purpose at trial, GINSBERG successfully objected to the accuracy of the transcript.

96.     GINSBERG did not turn over any crime scene photos and/or diagrams, despite several specific requests by the defense being made all the way into jury selection.

97.     Each time GINSBERG was asked to disclose any crime scene photos and/or diagrams, he claimed that none existed and that he had rechecked his files.

98.     GINSBERG did not turn over the audiotaped statement or grand jury testimony of Raheem Graham, despite Graham having given a detailed description of the shooter but not identify PLAINTIFF at the line up. The Defense was never made aware that Graham had testified before the grand jury until post-conviction FOIL requests.

99.     Rather than comply with his constitutional and statutory obligations, GINSBERG systematically mislead the court, the jury and defense concerning the circumstances under which his main witnesses would testify, introduced testimony from these witnesses and made argument which he knew was false or misleading, and withheld Brady and Rosario material he knew or should have known that he was required to disclose, including evidence that clearly proved that Danny Blackmen was testifying falsely as well as the fact that PLAINTIFF was innocent.

100.    Despite having testified before the grand jury under oath that he, Blackmen, did not "see the shooters face or a gun, "but only say the backs of three hooded gunmen, one allegedly wearing

---

[12] Unbeknownst to the defense, in 1988, GINSBERG, along with his supervisor Kenneth TAUB and Detective Louis SCARCELLA collaborated to wrongfully convict another defendant on a murder charge, together they collaborated to fabricated evidence, withhold Brady material, knowingly present perjured testimony to the courts and defense attorneys. *Carlos Davis v. The City of New York, 16-cv-03685 (AMD) (EDNY, 2016)*

a jacket like the one that he had allegedly saw "Emel "wearing early that night and heard a pop and saw a muzzle flash when Powell was shot.

101.    At trial, GINSBERG falsely elicited from Blackmen that Blackmen saw the shooter's face, watched him pull a gun out of his waist and shot Powell, and the face that he saw was Emel.

102.    That Blackmen, stood in the doorway of the community center, with the door opened at a 90-degree angle, and witnessed the shooting. When asked to describe the area where the shooting occurred Blackmen described "like where the trees, and flowerpots are, you have to step over the thing to get in there, like where the stoop is at." That did exist in the crime scene, and it was on the side and at the rear of the community center as the crime scene photos would have proven.

103.    Blackmen testified that "Duwan Moore came over to Thomas after the initial altercation and sat him down in the chair and told him to calm down it's not that bad…… and again that Duwan Moore broke up the fight between Powell" and Courtier.

104.    Minutes before Blackmen was set to take the stand at PLAINTIFF'S trial, GINSBERG stood in the hallway just outside of the Courtroom and instructed Blackmen regarding how Powell "would have had to have been standing when he was shot, in order for the bullet to have traveled from the upper right to lower left of Powell's chest,"  using his own body as a demonstrative aid while instructing Blackmen.

105.    GINSBERG knew that Blackmen did not see a shooters face, because he had testified under oath before the Grand Jury that his sole basis of identification was alleged to have been a jacket, that he did not see a face and that the shooter was fully hooded with his back to Blackmen.

106.    GINSBERG also knew that Blackmen could not have witnessed the shooting at all based upon his own description of the shooting location and the crime scene photos. The crime scene photos clearly show that the area described by Blackmen was to the left of the, outwardly opening, community center door and on the side of the building. Moreso, the community center door opens outwards to an L shape which was an additional obstruction to Blackmen having witnessed the shooting as shown in the crime scene photos.

107.    The "stoop and trees" are one the side of the community center building, near the top of the ramp by the tunnel where Powell attempted to "chase" the shooter and collapsed. Because GINSBERG knew that the bullet that hit Powell, pierced the upper lobe of his right lung, the right atrium of the heart, and the lower lobe of left, under that condition Powell could only take less than 5 to 10 steps. So, the shooting could not have happened near the community center door and

Powell "chase "the shooter up the incline of the ramp and to the tunnel before he collapsed 80 to 90 feet after the injuries that he had sustained.

108.    GINSBERG further knew that Blackmen had not witnessed the shooting which is why he personally instructed Blackmen on how the shooter would have had to be positioned in relations to Powell and the weapon aimed for Blackmen's testimony to align with the coroner's testimony.

109.    GINSBERG also knew that Duwan Moore was not present inside of the community center before or during the shooting based upon Moore's own statement to the police on October 27, 1990, at Kings County Hospital and Thomas' interviews and testimony.

110.    GINSBURG also falsely elicited from Thomas, for the first time at trial, that Thomas had identified PLAINTIFF in the lineup because PLAINTIFF'S "ears stick out," Thomas had never described this feature of PLAINTIFF until after having repeatedly saw PLAINTIFF during court proceedings and had not provided any description of the shooter except that he had a hood covering his face.

111.    GINSBERG was rewarded for his unconstitutional withholding of Brady material, that prevented the defense from properly cross examining Blackmen, when the deliberating jury requested the crime scene photos or a diagram only to be told by the Court, "If none was submitted during the trial, there's nothing for me to give you."

112.    GINSBERG was again rewarded for his unconstitutional conduct at trial when Brooklyn Supreme Court Judge Thaddeus Owen, initially granted the defense request to dismiss one count of murder in the Second Degree based upon Thomas' testimony, only to reverse himself the following day after he considered Thomas' testimony in conjunction with Blackmen's trial testimony.

113.    Instead of correcting the false testimony and fabricated evidence, GINSBERG capitalized off the testimony by hammering home during his closing statement at trial, how Blackmen had saw the shooters face and knew the allegedly shooters name..."  Ginsburg also informed the jury that Thomas was able to identify the PLAINTIFF as the shooter because his "ears stick out."

114.    The PLAINTIFF was not able to effectively counter this testimony since obtained the crime scene photos and diagrams for the first time in 1997, after several FOIL Request to the

KCDA and a court order during an article 78 proceeding, and they had not been presented to the grand jury.[13]

115.    GINSBERG'S biggest reward for his unconstitutional conduct was when the jury convicted PLAINTIFF on all counts of the indictment, including those counts that had been submitted by the Court in the alternative.

## PLAINTIFF'S CONVICTION, MOTION TO VACATE CONVICTION BEFORE SENTENCE IS IMPOSED, SENTENCINGS AND UNSUCCESSFUL DIRECT APPEAL

115.    On February 18, 1992, a jury convicted PLAINTIFF on all counts of the indictment, Murder in the Second Degree (2 counts), Criminal Possession of a Weapon in the Second Degree and Criminal Possession of a Weapon in the Third Degree.

116.    On March 31, 1992, Assistant District Attorney Maria Leonardo falsely accused the PLAINTIFF of harassing the victim's family and requested that the PLAINTIFF be admonished by the Court which, if accepted as true, would have certainly affected the PLAINTIFF'S sentencing penalty adversely.

117.    Judge Owens found that there was nothing threatening or harassing at all about the letter's contents, PLAINTIFF simply expressed his condolences to the family for their loss and expressed his innocence regarding the allegations that he had been convicted of.

118.    On or about March 10, 1992, trial counsel for PLAINTIFF filed a motion to vacate the judgement pursuant to *CPL § 330.30* based upon newly discovered evidence, an affidavit from Jadon Jones, attesting that on October 27, 1990, he was coming around the corner from Marcus Garvey Blvd (formerly Sumner Avenue) heading to the party. As he neared the gate to the courtyard, Blount was running out of the gate towards Marcus Garvey Blvd and tried to hand Jones a gun saying, "take this I just hit (shot) this kid (Powell)."

119.    The prosecution did not investigate, interview Jadon Jones or Blount, but opposed the motion arguing that Blount's name as the shooter had been previously mentioned prior to the trial, considering their KCDA's position Judge Owens summarily denied PLAINTIFF'S motion.

---

[13] GINSBERG was asked about his and Detective Louis SCARCELLA's unconstitutional conduct in some past Brooklyn, New York murder cases in a September 2013 New York Times Interview and GINSBERG defended himself and Detective SCARCELLA's conduct, while acknowledging that some of his case look bad in retrospect, went on to defend the duo's unconstitutional conduct as being fair for the 80's and 90's, despite case law holding contrary. *Robles, France "As Doubts over Detective Grew, Prosecutors Also Made Missteps." Sept. 5, 2013, The New York Times.*

120.    On May 22, 1992, PLAINTIFF was sentenced to 22 years to life for one count of murder in the second degree, the second count of murder in the second degree based upon an alternative theory was vacated by the Court, and 3-9 years for criminal possession of a weapon to be served concurrently.

121.    On direct appeal, PLAINTIFF'S counsel argued that evidence of intent to kill was insufficient, due process was violated by the jurors finding of conflicting mental states, that court erred in denying the *CPL § 330.30* motion without a hearing and that a sentence of 22 years to life for a seventeen-year-old defendant was harsh.

122.    KCDA opposed PLAINTIFF'S direct appeal arguing that the identification of the prosecution witnesses was overwhelming evidence of PLAINTIFF'S guilt as Powell's shooter, and on June 12, 1995, PLAINTIFF'S conviction was affirmed.

## THE FALSE DENIAL OF PLAINTIFF'S FOIL REQUESTS

123.    Knowing that he was innocent, PLAINTIFF believed that there had to be evidence that would explain why witnesses had provided false testimony against him and that would help prove his innocence, namely crime scene photos. PLAINTIFF attempted to discover the evidence through a series of requests to the Kings County District Attorney's Office under New York States Freedom of Information Law (FOIL), *Public Officers Law §§ 84-90, 21 N.Y.C.R.R. § 1401*.

## The Law Regarding FOIL Requests

124.    The FOIL, requires New York governmental agencies, including a District Attorney's Office, to permit the public to inspect and copy every record they hold, excepting only those records that fall within one of ten narrowly defined grounds for withholding records. Once a witness in a criminal case testifies in open court, or if records pertaining to that witness were required to be disclosed to a defendant as written Brady or Rosario material, such records must also be disclosed to that defendant under the FOIL.

125.    The FOIL also requires agencies to designate both Records Access and Appeals Officers. The Records Access Officer receives and responds to FOIL requests. He may grant access to the records or, if the records are exempt from disclosure, withhold the records and explain his reasons for doing so in writing.

126.    The person making the request may then administratively appeal to the agency's Appeals Officer, who is required to overturn the denial and grant access if the records do not properly fall within the grounds for denying access.

127.    Both the Records Access Officer and the Appeals Officer are prohibited by law from denying a request by falsely claiming that a requested record does not exist. Indeed, it is a violation of the New York Penal Law to intentionally prevent the public from inspecting records requested under the FOIL. *See Penal Law § 240.65.*

128.    At the same time, as representatives of the District Attorney's Office, FOIL officers have a continuing constitutional obligation to disclose material exculpatory evidence that the Office should have disclosed at trial under Brady.

129.    If the Appeals Officer upholds the Records Access Officer's denial of a FOIL request, the requester may then commence a civil lawsuit, under Article 78 of the New York Civil Practice Law and Rules, to challenge the agency's decision. However, New York law requires courts hearing such lawsuits to defer to an agency if it claims that the requested records could not be located. In other words, the entire system assumes and relies upon the truthfulness and honesty of the Records Access and Appeals Officers.

**PLAINTIFF'S 1994, 1995, 1996 and 1997 FOIL Request**

130.    PLAINTIFF made several FOIL requests to the KCDA, in relation to his case between 1994 through 1996, for any and all Brady and Rosario material, crime scene photos, and all documents, among other things.

131.    In 1994, PLAINTIFF'S appellate attorney was considering filing a *CPL § 440.10* motion and PLAINTIFF had informed her of the relevance of the crime scene photos, and the fact that Graham had not made a positive identification because the shooter's face was covered  and neither the crime scene photos, crime scene diagram, nor  Graham's grand jury testimony or audio taped statement itself and transcript had not been a part of the defense trial file that she had received, PLAINTIFF sought to obtain the files.[14]

132.    In October 1996 Grahams audiotaped statement was acknowledged to being in possession of KCDA but access was denied, despite Graham having stated that he could not identify the shooter because of a hood blocking the shooter's face and was Brady material. PLAINTIFF did not receive any Graham's grand jury or audio taped testimony until it was requested in 2009 after Judge Ingram had granted a hearing pursuant to *CPL § 440.10.*

---

[14] On July 13, 1994, PLAINTIFF'S appellate attorney reminded PLAINTIFF to send her a copy of the crime scene photos and/or diagrams if he received any through FOIL.

133.    Finally, in January 1996, PLAINTIFF received several documents and statements, but in response to his request for crime scene photos and diagrams, PLAINTIFF received a 1-page boiler plate crime scene unit diagram and informed that those were all the records in possession of the KCDA that was responsive to PLAINTIFF'S request.

134.    Plaintiff appealed the denial of the actual crime scene photos and filed an Order to Show Cause pursuant to CPLR Article 78 which was titled, *Mcdowell v. Hynes, Index No. 15982/97*, Kings Co. Supreme Court, Judge Herbert Kramer. In response to PLAINTIFF'S Order to Show Cause, KCDA attached the crime scene the crime scene photos as an exhibit to their opposition.

135.    However, in July 1997, PLAINTIFF received a second line-up receipt for Thomas that had been created by SPOTO simply stating that Thomas chose number 4 during the line-up and said that this was who shot Powell.

136.    Despite having been previously informed that PLAINTIFF had received "all of the responsive records in KCDA's possession. The July 1997 response to PLAINTIFF'S request included an additional 281 pages of documents, and a denial of additional medical records related to Powell and states of "other witnesses."

137.    The repeated denial of the existence of crimes scene photos and diagrams from 1991 through 1997 and the existence of no other police reports was false.

138.    PLAINTIFF administratively appealed that denial to no avail.

139.    PLAINTIFF contacted the committee on open government to complain about the denials and filed a follow-up FOIL request attaching the crime scene unit diagram and other documents and finally in 1997 after commencing an article 78 proceeding PLAINTIFF received some of the documents that he's previously sought besides Raheem Graham's audiotaped statement and grand jury testimony.

### PLAINTIFF FILE'S PRO-SE CPL 440.10 MOTION SEEKING TO VACATE JUDGEMENT AND THE CONVICTION

140.    October 5, 2008, PLAINTIFF, moved to vacate his judgement and conviction, and for a new trial.

141.    PLAINTIFF'S motion relied on the results of his challenging and intense 12-year re-investigation of his case, including FOIL requests and litigation, court records, and witness interviews.

142.    PLAINTIFF'S motion contended that PLAINTIFF'S conviction should be vacated based upon newly discovered evidence and actual innocence which consisted of several new eyewitness affidavits accusing Blount of being the shooter, while others would testify that PLAINTIFF was not the shooter and was not in the immediate vicinity of the shooting.

143.    The opening of the motion was based upon a January 30, 1991, Letter from Blount, who was then in Florida, to PLAINTIFF who was on Rikers Island. In the letter Blount while strongly indicating that he shot and killed Powell goes on to say how "he's struggling mentally and emotionally, asking for PLAINTIFF'S forgiveness and how he's hurting because one of his best friends is locked up for something that he didn't do.  Blount also said that if one of us did not do what we had to do we could've all be shot…."

144.    PLAINTIFF supported Blount's letter with newly discovered evidence, consisting of several eyewitness accounts that identified Blount as the shooter and describing PLAINTIFF as not having been involved in the shooting. that would have changed the verdict because of the deficiencies in the testimony of Blackmen and Thomas.

145.    PLAINTIFF also alleged Ineffective Assistance of Counsel, for counsel's failure to cross examine Blackmen and Thomas by utilizing the material inconsistencies in the witness's prior testimony and statements, and counsel failing to visit the crime scene and have his own photos taken when the prosecution had failed to honor their constitutional Brady obligations.

146.    On March 26, 2009, the KCDA, staying true to the policies of the Hynes administration, sought to maintain the convictions without regard for guilt or innocence, did not investigate any of the allegations contained in the motion, did not deny that the crime scene photos had never been provided to counsel, but  argued how compelling Blackmen's testimony and identification was and beyond reproach, that Blount's name had been mentioned as the shooter since October, 1990 so the evidence was not newly discovered and requested that the Court summarily deny the application in its entirety.

147.    PLAINTIFF strongly opposed KCDA's position point by point in a reply motion.

148.    On August 14, 2009, Kings County Supreme Court Justice, Honorable John G. Ingram, disagreed with KCDA's position and found that the documentary evidence attached to the motion could have, more likely than not changed the verdict at the PLAINTIFF'S 1992 trial, and ordered an evidentiary hearing on both the newly discovered evidence-actual innocence claim as well as the ineffective assistance of counsel claim.

149.    As part of PLAINTIFF'S *CPL §440.10* motion, "Exhibit # 14" consisted of eight pages of New York City Department of Buildings Permits showing that between 2002 and 2005 the entire community center and courtyard area have been demolished to dirt and that new structures of various purposes were built to replace the previous community center and courtyard structures.

150.    On December 14, 2009, in an attempt to undermine the PLAINTIFF'S *CPL § 440.10* motion and the post-conviction crime scene photo obtained from KCDA, then Homicide Bureau Chief, TAUB, had sent investigators out the night before court, had them take photos of the new structures and attempted to utilize the 2009 photos to argue that PLAINTIFF'S witnesses could identify the area where the shooting occurred on October 27, 1990, so were not credible, and PLAINTIFF'S claims that the photos proved that Blackmen could not have witnessed the shooting from the doorway of the community center was baseless. When TAUB'S dishonest ploy was pointed out to the court by PLAINTIFF'S hearing counsel, TAUB simply shrugged his shoulders and said, "Oh."[15]

151.    Once TAUB'S crime scene photo ploy failed, which had shaken PLAINTIFF to his core to realize that after 19 years nothing had changed in the Charles Hynes administration and that KCDA maintained a policy of suppressing innocence in favor of maintaining convictions, TAUB offered PLAINTIFF an 8-1/3-to-25-year sentence.

152.    PLAINTIFF verbally and openly declined the offer for two reasons, which he stated in court; a) he has never going to say that he shot Powell because he did not shoot Powell and had no involvement in his shooting and b) he would never agree to report to parole for additional supervision after having served time 19 years and 2 months for a crime that he did not commit.

153.    Upon hearing PLAINTIFF'S objections, TAUB responded a) "Oh, we know that you didn't shoot Johnathan Powell, but we think that you were involved," b) "you have 19 years in so if you take a 6-18 and you don't have to say that you shot Powell, you can simply say that you were outside at the time of the shooting and had a gun, you'll be home for Christmas."

---

[15] Taub was a supervisor in KCDA from at least 1988 until he retired in March 2017. Taub oversaw not less than 29 wrongful convictions and actively participated in the unconstitutional misconduct that resulted in many of the wrongful convictions in Brooklyn as a matter of policy, including matters involving GINSBERG and Det. SCARCELLA, see e.g., *Carlos Davis v. The City of New York, 16-cv-03685 (AMD) (EDNY, 2016); see also Exhibit A,* List of 64 Court Decisions finding that KCDA Prosecutors violated Brady, knowingly used false or misleading evidence, and made improper remakes in summation.

154.    Upon seeing PLAINTIFF'S reluctance to accept any offer, Taub reasoned, "well you had a gun before so what's the difference, you can say that and go home, up to you."

155.    When TAUB was reminded that the evidence in the *CPL § 440.10* motion showed that either the PLAINTIFF shot Powell or he was innocent based upon the facts of the case and asked why he won't dismiss the charges, TAUB responded, "sometimes in the pursuit of justice the truth is lost," and shrugged his shoulders once again.

156.    When Taub was asked alternatively, to consent to completing the Ineffective Assistance of Counsel claim first since PLAINTIFF'S trial attorney was present and ready, then after TAUB bail could be considered while the more extensive Newly Discovered Evidence Claim was being heard. Taub responded that he "would not consent to a hearing commencing in 2009, would not consent to separating the hearing, would not consent to bail even if the application was successfully on either or both claims, and would retry the PLAINTIFF'S criminal case if it the conviction was reversed.

157.    TAUB next stated "either he's (PLAINTIFF) going to accept the deal or not he has to decide today, even if the conviction is vacated next year, we're opposing bail and retrying the case."

158.    PLAINTIFF, who was arrested at the age of 17 years old as a honor roll high school student, who was scheduled to graduate high school 90 days after his arrest in 1990, and had went to trial, filed a CPL 330.30 motion, fought appeals, Article 78 motions, ultimately a *CPL 440* motion and spent over a decade reinvestigating his own case, found himself in a state of disgust, shock and distrust of the KCDA's office who was once again showing that they would stop at nothing to obtain and maintain his conviction, even if he is innocent.

159.    On December 14, 2009, PLAINTIFF, agreed that he would accept the plea offer and acquiesce to what TAUB had previously said regarding PLAINTIFF possessing a firearm, that he "was outside when Powell was shot and that he possessed a firearm." because as TAUB had stated to PLAINTIFF previously you "did have a gun before, I see that you had a possession case, so what's the big deal." Plaintiff was given a choice of possibly spending the rest of his life in prison or continuing to battle the corrupt Hynes administration that had already been in existence for almost 20 years with no end in sight.

160.    PLAINTIFF had always maintained his innocence and went to trial believing that the prosecution would be fair and falsely believed that upon seeing the new evidence that had

accumulated over 19 years that the KCDA would, at a bare minimum, investigate. Unfortunately for PLAINTIFF, the policy of maintaining wrongful convictions by any means necessary still prevailed at KCDA in 2009.

161.    For his plea, which did not include any statement from PLAINTIFF that he shot Powell or had any prior knowledge of the shooting, TAUB consented to the vacatur of the PLAINTIFF'S conviction, PLAINTIFF was resentenced to 6 – 18 and released from Rikers Island on December 16, 2009, 7 days before his birthday, 9 days before Christmas and 19 years and 2 months after being arrested and two days after he'd plead guilty.

## KINGS COUNTY DISTRICT ATTORNEY'S OFFICE CONVICTION REVIEW UNIT.

162.    In 2018, PLAINTIFF began petitioning the KCDA's Conviction Review Unit to review PLAINTIFF'S case.

163.    The Conviction Review Unit accepted the PLAINTIFF'S case and in June 2022 obtained a confession from Blount admitting that on October 27, 1990, that he and not PLAINTIFF shot Powell once in the chest and killed him.

164.    In March 2023, after completing their investigation, the KCDA issued a report on the killing of Johnathan Powell fully exonerating PLAINTIFF. It is attached as Exhibit "B" to the complaint.

165.    In that report, KCDA acknowledges that "[i]n hindsight, based on the new evidence CRU discovered, [PLAINTIFF]'s plea of guilty to manslaughter was not warranted and that PLAINTIFF "accepted the People's offer for freedom and in doing so was compelled to falsely admit to accomplice liability." *See* Ex. B at pages 27 and 31.

## PLAINTIFF'S Damages and Injuries

166.    PLAINTIFF'S injuries and damages include, but are not limited to:

(a) His false and malicious prosecution and conviction for murder, and criminal possession of a weapon, and sentence of   22 years to life in prison;

(b) The wrongful denial or delay of his challenges to his conviction filed in State Court;

(c) His loss of his liberty for a total of 19 years and 2 months which deprived him of freedom of choice; options; enjoyment of life; advancement of education and career; family; experiences and all the things that freedom provides.

(d) Physical injuries he suffered during assaults by other inmates, and the mental and emotional effects of such assaults and of the gruesome, terrifying homicidal and disfiguring assaults on other inmates he witnessed;

(e) Past and future physical illnesses and injuries as a result of his wrongful conviction and his experiences in prison;

(f) Past and future mental and emotional injuries and suffering;

(g) The loss of the services, society, companionship, and consortium of mother, grandmothers, brother, and other family members and friends;

(h) The loss of employment income, and diminution of future earning ability, due to his inability to complete his education and to realize his dream of becoming an attorney;

(i) Legal fees and expenses for which he is responsible exceeding $400,000 based upon more than one thousand hours of attorney time necessitated by exhaustive investigation and litigation required to uncover KCDA and NYPD misconduct;

## FIRST CAUSE OF ACTION

(**Malicious Prosecution and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; 42 U. S. C. & 1983; All Defendants**)

167.    PLAINTIFF realleges the allegations contained in the foregoing paragraphs of this Complaint and incorporates them here and in all following paragraphs.

168.    SPOTO, FISCH and FALCONE individually, collectively, acting in concert and aiding abetting one another, intentionally, knowingly, and willfully manufactured, or caused the manufacturing of, false statements and identifications by THOMAS and BLACKMEN, which they improperly compelled or induced THOMAS and BLACKMEN to adopt, accusing PLAINTIFF of Powell's murder.

169.    SPOTO, FISCH and FALCONE knew that the statements and identifications would be relied on by the KCDA and the court as a basis to authorize PLAINTIFF'S arrest, and to formally initiate his prosecution, and that the statements and identifications would be introduced into evidence at PLAINTIFF'S trial.

170.    BLACKMEN and THOMAS' statements and identifications were in fact introduced during PLAINTIFF'S pretrial Wade hearing and trial.

171.    By virtue of the foregoing, SPOTO, FISCH and FALCONE, with actual malice, initiated, continued, or caused the initiation and continuation of, criminal proceedings against PLAINTIFF

that they knew, or should have known, there was no probable cause for, and for which in fact there was no probable cause, and thereby caused PLAINTIFF to be deprived of his liberty. Those proceedings were terminated in PLAINTIFF'S favor, *See Exhibit A* (Certificate of Disposition in *People v. Emel Mcdowell*, Kings Co, Ind. No. 12088/90).

172.   SPOTO, FISCH and FALCONE knew, but withheld from the KCDA, either permanently or for a substantial period, and therefore from the court and the defense, exculpatory or impeaching evidence that tended to negate PLAINTIFF'S guilt and which they knew or should have known the law required them to timely disclose. This evidence included, but was not limited to, the items detailed above.

173.   The aforesaid conduct, which SPOTO, FISCH and FALCONE committed individually, collectively, in concert with and in aid of each other, and/or in concert or conspiracy with other named and unnamed individuals, operated to deprive PLAINTIFF of his rights under the Constitution and the Laws of the United States:

(a) Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(b)Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c)To timely disclosure of all material evidence favorable to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

170.   The foregoing violations of PLAINTIFF'S federal constitutional rights by SPOTO, FISCH and FALCONE directly, substantially, proximately, and foreseeably caused the initiation and

continuation of PLAINTIFF'S criminal prosecution, his loss of liberty, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

171.    The foregoing violations of PLAINTIFF'S rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the SPOTO, FISCH and FALCONE'S employment and authority.

172.    SPOTO, FISCH AND FALCONE committed the foregoing violations of PLAINTIFF'S rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to his constitutional rights or to the effect of such misconduct on his constitutional rights.

173.    By reason of the foregoing, SPOTO, FISCH and FALCONE are liable to PLAINTIFF for compensatory and punitive damages.

174.    The CITY is liable for these wrongs by virtue of (a) KCDA-HYNES' and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer) direct participation in the civil conspiracy to continue and cover-up PLAINTIFF'S wrongful and malicious arrest, prosecution, and conviction. See ¶¶ 207-341, infra (Monell claims against the CITY).

<u>SECOND CAUSE OF ACTION</u>

(**Wrongful Arrest and Detention Under The Fourth Amendment and Manuel v. City of Joliet, 137 S.Ct. 911 (2017); 42 U.S. C. $ 1983; All Defendants**)

175.    PLAINTIFF realleges the allegations contained the foregoing paragraphs of this Complaint and incorporates them here and in all following paragraphs.

176.    SPOTO, FISCH and FALCONE, individually, collectively, acting in concert, and aiding and abetting each other, intentionally, recklessly, and with deliberate indifference to PLAINTIFF'S constitutional rights, without probable cause, and in disregard of overwhelming evidence of PLAINTIFF'S innocence, wrongfully arrested and detained PLAINTIFF for Powell's murder.

177.    SPOTO, FISCH and FALCONE, in absence of probable cause for PLAINTIFF'S continued seizure, continued the seizure by making false representations and submitting false reports to the KCDA which continued the charges against PLAINTIFF and his detention and/or seizure,

178.    The defendants intended to confine PLAINTIFF. PLAINTIFF was conscious of the

179.     confinement, did not consent to it, and the confinement was not otherwise privileged.

180.     By virtue of the foregoing SPOTO, FISCH and FALCONE are liable for PLAINTIFF'S wrongful arrest and detention, and the damages set forth in ¶ 163 above.

181.     The CITY is liable for these wrongs by virtue of (a) Hynes' and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer), direct participation in the civil conspiracy to continue and cover-up PLAINTIFF'S wrongful arrest, malicious prosecution, and conviction. See ¶¶ 207-341, infra (Monell claim against the CITY).

### THIRD CAUSE OF ACTION

**(Evidence Manufacturing; Denial of A Fair Trial Under The Fifth, Sixth, and Fourteenth Amendments; 42 U.S. C.§ 1983; All Defendants)**

182.     PLAINTIFF realleges the allegations contained in the foregoing paragraphs of this Complaint and incorporates them here and in all following paragraphs.

183.     SPOTO, FALCONE AND FISCH, individually, collectively, acting in concert, aiding, and abetting the other, intentionally, · recklessly, and with deliberate indifference to PLAINTIFF'S constitutional rights manufactured false evidence against PLAINTIFF.

184.     Specifically, on October 27, 1990, SPOTO, FALCONE AND FISCH manufactured BLACKMEN and THOMAS' false statements and identifications implicating PLAINTIFF in the murder, and created the false October 27, 1990, reports purporting to contain genuine statements freely given by Blackmen and Thomas.

185.     On October 27, 1990, SPOTO, acting in concert with FALCONE AND FISCH, manufactured a photographic identification of PLAINTIFF by Thomas.

186.     Thomas, who did not know the perpetrator, could not describe the shooter "because of a hood blocking" the shooter's face, did not identify PLAINTIFF, but instead informed SPOTO and FALCONE that it was either number 4 a darked complexioned, slim person or number 5 a heavier light brown complexioned line up filler, "he wasn't sure". After, SPOTO told Thomas the PLAINTIFF'S position in the line-up, Spoto created a second line-up receipt that showed that THOMAS had simply identified the PLAINTIFF, saying "he shot Powell."

187.    On October 27, 1990, SPOTO and FISCH, acting in concert with, FALCONE manufactured a photographic identification of PLAINTIFF as Powell's killer by BLACKMEN.

188.    SPOTO and FISCH knew that Blackmen did not actually see the shooting and who provided a narrative that was not physically or medically possible.

189.    SPOTO, FALCONE AND FISCH then reported that false identification to the KCDA, which relied on it, among other things, to deem PLAINTIFF the perpetrator, and bring and maintain charges against him.

190.    By virtue of the above, SPOTO, FALCONE AND FISCH coerced Thomas and Blackmen into falsely "identifying" PLAINTIFF in the lineup as Powell's shooter.

191.     SPOTO, FALCONE AND FISCH then forwarded the above information to the KCDA and made verbal representations to KCDA prosecutors affirming the truth and reliability of THOMAS and Blackmen's statements, the report memorializing it, and THOMAS' and Blackman's identifications of PLAINTIFF as the perpetrator.

192.    The KCDA in turn relied on this "evidence" to commence formal criminal proceedings against PLAINTIFF, and later introduced that evidence against PLAINTIFF during his pretrial hearing and during his criminal trial.

193.    The above manufactured evidence was likely to, and did, influence the jury's decision.

194.    SPOTO, FALCONE AND FISCH actions deprived PLAINTIFF of his right to not be prosecuted on fabricated evidence, and to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and were the proximate cause of his injuries.

195.    By reason of the foregoing, SPOTO, FALCONE AND FISCH are liable to PLAINTIFF for compensatory and punitive damages.

196.    The CITY is liable for these wrongs by virtue of (a) Hynes' and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline  their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer) direct participation in the civil conspiracy to continue and cover-up PLAINTIFF'S wrongful arrest, malicious prosecution, and conviction. See¶¶ 26- 161, infra (Monell claims against the CITY).

## FOURTH CAUSE OF ACTION

**(Suppression of Brady v. Maryland, 373 U.S. 83 (1963) and Denial Of A Fair Trial Under The Fifth, Sixth, Fourteenth Amendments; All Defendants)**

197.    PLAINTIFF realleges the allegations contained in the foregoing paragraphs of this Complaint and incorporates them here and in all following paragraphs.

198.    SPOTO, FALCONE AND FISCH, individually, collectively, acting in concert, aiding and abetting, and conspiring with each other, intentionally, recklessly, and with deliberate indifference to PLAINTIFF'S constitutional rights, suppressed from the KCDA and PLAINTIFF (a) the exculpatory and impeaching information detailed in above, (b) their creation of false police reports, (c) their false representations to the KCDA to convince that office to criminally charge PLAINTIFF, and (d) their own and each other's misconduct.

199.    As a result of those defendants' suppression, GINSBERG did not disclose the exculpatory information detailed in the preceding paragraphs, and repeatedly failed to correct the false testimony elicited by him and argument that flowed from the suppression of that evidence.

200.    The suppressed evidence was material, likely to influence a jury's decision, and there is a reasonable probability that had the evidence been disclosed to the defense, the result of PLAINTIFF'S trial would have been different.

201.    Defendant's actions deprived PLAINTIFF of his right:

(a) Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(b) Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c) To timely disclosure of all material evidence favorable to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

202.   The foregoing violations of PLAINTIFF'S federal constitutional rights. DEFENDANTS and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of PLAINTIFF'S criminal prosecution, loss of liberty, detention without bail, wrongful conviction, subsequent imprisonment, and other injuries and damages,

203.   The foregoing violations of PLAINTIFF'S rights amount to constitutional torts and were affected by actions taken under color of State law, and within the scope of Defendants employment and authority.

204.   Defendants committed the foregoing violations of PLAINTIFF'S rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to PLAINTIFF'S constitutional rights or to the effect of such misconduct on those rights.

205.    By reason of the foregoing, Defendants are liable to PLAINTIFF for the damages detailed in ¶163, above.

206.   The CITY is liable for these wrongs by virtue of (a) Hynes' and the NYPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer) direct participation in the civil conspiracy, concerted action, and aiding and abetting . Defendants following PLAINTIFF'S conviction, to conceal and continue the suppression of this Brady material. See¶¶207-341infra (Monell claims against the CITY)

## FIFTH CAUSE OF ACTION

**(Monell/42 U.S.C. § 1983: Claim Against the CITY based on the KCDA's unconstitutional policies, customs, and practices, and failure to supervise, discipline, and rectify amounting to deliberate indifference)**

207.    PLAINTIFF repeats the allegation in the foregoing paragraphs and incorporates them here and in all following paragraphs.

208.    In 1989 New York City was plagued with an astonishing 1,905 murders, more than any other year in the city's history. The next year —1990, when Charles J. Hynes took office as District Attorney for Kings County, the number was even worse. The city, struggling to contain an exploding crack-cocaine epidemic and the violence accompanying it, saw murders skyrocket to 2,605. Almost half of those murders occurred in Brooklyn.

209.    A September 7, 1990, front page article in the New York Post aimed at then NYC Mayor David Dinkins captured the climate at the time: Crime Ravaged: "City Cries Out For Help: 'Dave, Do Something!"[16]

210.    In response, Hynes, the Kings County District Attorney from 1990 to 2013, who campaigned on a "get tough on crime" platform, instituted a series of no holds barred, anything goes, scorched earth, policies. The policies were aimed at winning convictions at any cost, including by suppressing exculpatory evidence and using false testimony, coercing witnesses to provide testimony the office desired, irrespective of its truth or falsity, and disregarding any collateral damage inflicted in the process.

211.    Specifically, during the entirety of Hynes' time in office, including the time of the Powell's October 27, 1990 murder investigation and PLAINTIFF'S 1990 arrest, prosecution, and conviction, Hynes maintained affirmative or de facto office-wide unconstitutional or improper policies, customs, and practices that evinced deliberate indifference to the constitutional rights to due process and a fair trial, under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, of defendants who were investigated, arrested, or prosecuted by that office, including,

> (a)Refraining from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses in order to avoid creating "Rosario material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as Brady material. Indeed, under the KCDA's "riding" program, prosecutors were permitted and encouraged to make a record of statements that tended to inculpate a suspect or defendant, while ignoring statements that were inconsistent with their belief about the suspect's or defendant's guilt, or the office's narrative of the case, see Exhibit "C" to the complaint, Riding Program Memorandum.

---

[16] 'Ed Koch, Ray Kerrsion, Jerry Nachman, *Crime Ravaged City Cries Out For Help: 'Dave, Do Something!* New York Post, September 7, 1990, p. 1.

(b)The improper manipulation of witnesses, and creation of false or inherently unreliable testimony, through physical and psychological coercion, threats, unlawful detentions, and promises of rewards,

(c)The toleration of police and detectives who used such practices, especially those handling homicide and other high-profile cases,

(d) Withholding prosecution witnesses' pretrial recantations if the prosecutors disbelieved, or at least claimed to disbelieve, the recantations, a blatant violation of Brady which requires any objectively favorable information to be disclosed to the defense,

(e)The maintenance of an illegal "office-subpoena" practice, repeatedly condemned by New York courts, whereby subpoenas were used to coerce witnesses into meeting with prosecutors at the KCDA, and if the witnesses refused to appear, they would be brought to the KCDA against their will,

(f) The maintenance of an illegal material witness warrant practice, whereby material witness warrants were obtained with false affirmations and, instead of bringing witnesses to court "forthwith" as required under New York law, material witness warrants were used to force witnesses to meet with prosecutors at the KCDA and circumvent the witness statutory right to counsel. Moreover, both the detective-investigators and the prosecutors who obtained the material witness warrant would affirmatively lie to the witness that the only choice the witness had was to go to jail or "agree to be held in the KCDA's custody, when as a matter of law, the witness was entitled to an evidentiary hearing, had the possibility of being ordered released, and the court was mandated to grant the witness a reasonable bail if detention was ordered,

(g)The maintenance of an illegal "Hotel Custody Program," in which the KCDA, with no legal authority to do so, imprisoned recalcitrant witnesses to coerce them into testifying, deprived them of their statutory right to counsel, and held them incommunicado in hotel rooms as prisoners, with their hotel doors shackled, guarded by detective-investigators, and without the ability to use a telephone or have visitors without the prosecutor's permission,

(h) The maintenance of an illegal "order to produce" practice, by which prosecutors would obtain court orders to unilaterally have inmates produced from jail or prison to the courthouse, purportedly to have them appear as witnesses when, in truth, the cases which the inmates were produced on were not being heard, the prosecutors' claims otherwise were false, and the attorney affirmations used to obtain the order to produce were counterfeit ones which had been actually signed by a paralegal,

(i) The abuse of Damiani orders to coerce defenseless inmates into testifying against criminal defendants by (1) submitting false affirmations to the court purporting to have been affirmed to and signed by prosecutors but which were actually signed by a Homicide. Bureau paralegal (2) falsely representing in those "affirmations" that the target inmates asked to speak with the KCDA when, in truth, they had not and the prosecutors were unilaterally producing the inmates to the KCDA, (3) falsely representing to the court that the inmates would not be produced to the KCDA unless they consented, but then do nothing to honor that promise or ensure that the inmates consented to the production, and many times produce those inmates without their consent or against their will, and (4) not disclosing any of these circumstances to the defendants the inmates testified against,

(j) The secret practice of causing Corrections and State Division of Parole officials to revoke the release of former inmates to compel them to appear at the KCDA and to compel them to "cooperate,"

(k)The withholding from criminal defendants' favorable evidence under Brady and its progeny, including the KCDA's abuse of process to secure testimonial evidence,

(l)The knowing or reckless use of, reliance on, and failure to correct false, misleading, or inflammatory evidence and argument, and

(m)The KCDA's post-conviction policy and custom of covering up Brady/ Giglio violations committed by trial prosecutors described, below), by which the KCDA ensured defendants would never discover the Brady material suppressed from them at trial.

212.   The existence, in 1990-1993, of the policies, customs, and practices identified in above in ¶ 211 (a), (c), (d), (e), (f), (g), (h), (i), (j), and (m) is established by sworn admissions of former

KCDA prosecutors, KCDA records, and/or admissions by Hynes himself during his 2013 videotaped deposition in the Jabbar Collins 'case.[17]

213.    The unconstitutional policies identified above in ¶211(a), (b), (c), (d), (h), (i), (k), (1), and (m) in particular, were followed by GINSBERG and applied in PLAINTIFF'S case, and along with GINSBERG'S intentional suppression of Brady material ,[18] and  knowing use of false evidence and argument , directly caused PLAINTIFF'S constitutional injuries.

214.    The existence of Hynes policies of suppressing Brady material, knowingly using false or misleading evidence and argument, and improper and inflammatory summation is established by:

> (a)Sixty-four cases set forth in the attached Exhibit D, finding prosecutors violated Brady, knowingly used false or misleading evidence, and made improper summation arguments, Hynes' decision to reward most of the prosecutors who committed that misconduct rather than taking any steps to rectify it, and
>
> (b) The maintenance of the office-wide practice of deceiving judges in criminal cases with false Damiani, material witness, and order to produce affirmations, and failing to disclose that deception to defendants, a Brady violation in each of the cases in which it occurred.

---

[17] Se*e e*.g. Deposition of Charles J. Hynes in *Collins v. City of* New *York* 11 C*V 766* (FB) (RML), December 13, 2013 (admitting to Hotel Custody Program and practice of not taking notes); Deposition of Theresa Corrigan in Z*ahery v. City of New York,* 98 CV 4546 (LTS) (admitting to pretrial witness recantation practice); Hearing Testimony of Senior Homicide Prosecutor Stan Irvin during CPL § 440.10 Hearing in *People v. Tasker Spruill,* Ind. No. 13008/95, July 1998, (admitting t*o Damiani* practice); Deposition of KCDA Supervising Homicide Bureau Paralegal a Noonan Fitzpatrick in *Collins v. City of* New *York* 11 CV 766 (FB) (RML), May 10, 2013, pp. 53-56 (admitting to counterfeit affirmation and office subpoena practice); KCDAO's Appellant's Brief in *People v. Tasker Spruill, K*ings Co. Ind. 13008/95, pp. 24, 26-27 (conceding that "[t]he practice in the [DA's] Office at the time was for the paralegal to sign the ADA's name on the paperwork."); Deposition of KCDA Detective-Investigator Christopher Salsarulo in *Quezada v. Brown*, 08 CV 5088 (KAM) (VVP) (E.D.N.Y.), January 19, 2012, pp. 40-41, 65-67 (admitting to abuse of material witness warrants); Deposition Transcript of Supervising Detective-Investigator Stephen Bondor in *Collins v. City of New York*, 11 C*V 766* (FB) (RML), November 4, 2013, p. 50 (explaining the factual representations that would be made to material witnesses); Affirmation of Monique Ferrell in Opposition to Defendant's CPL$ 440.10 Motion, Nov. 3, 2006, p. 41 (discussing the KCDA's "usual practice of causing work release or parole to revoke the release of uncooperative former inmates); Exhibit B (KCDA riding program protocols).

[18]  A plaintiff is allowed to plead in the alternative*." Breton v. City of N*ew Y*ork,* 404 F.Supp.3d 799, 814 *(*S.D.N.Y., 2019) (Koeltl, J*),* citing Federal Rule of Civil Procedure 8(d).

215.     Additionally, the KCDA recently admitted that at the time of PLAINTIFF'S 1990 trial, the use of false evidence and suppression of Brady material were institutional failures of the *Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (evidence undermining the State's investigation is favorable material for Brady purposes).  Hynes administration and resulted in at least 25 wrongful convictions. See Kings County District Attorney's Office, 426 Years: An Examination of 25 Wrongful Convictions in Brooklyn New York, July 9, 2020, p. 14 ("Taken together, the wrongful convictions discussed here (including 13 cases prior to PLAINTIFF'S November 1993 conviction] all point to failures of the prosecution as an institution—whether through acts of individual prosecutors, collective decisions, or failure to train or guide prosecutors adequately") (emphasis added); p. 60 ("In many of the cases, prosecutors ... failed to disclose important relevant evidence. And in a number of cases, prosecutors failed to adhere to expectations of candor and diligence, thereby denying the defendants a fair trial")." [19]

216.     Hynes' deliberate indifference to the violation of defendants' constitutional rights by his employees is also demonstrated by his failure to investigate, supervise, and discipline prosecutors for their pattern of violating the rights of criminal defendants through the knowing use of false evidence, suppression of evidence required to be disclosed under Brady and its progeny, coercion of witnesses, and false or misleading summation arguments.

217.     Hynes' deliberately indifferent failure to investigate, supervise, discipline, and/or rectify his employees' violations of their Brady disclosure obligations, not to use false evidence and argument, and not to coerce and manufacture such false testimony, effectively encouraged those employees to do so, and created an "anything goes" atmosphere that caused such violations to continue, including those in PLAINTIFF'S case.

218.     In that regard, Hynes and his top lieutenants, his counsel, Dino Amoroso, his Chief of Investigations and former Chief of the Homicide Bureau Michael Vecchione, his Chief Assistant, Amy Feinstein, Deputy Bureau Chief and future Bureau Chief  of Homicide, Kenneth Taub and numerous other ADAs and supervisors, admitted in sworn depositions in *Collins v. City of New York*, et., 11 CV 766 (FB)(RML) (E.D.N.Y.), *Zahrey v. City of New York*, No. 98 Civ. 4546, 2009 WL 54495 (S.D.N.Y.), and other cases, that Hynes and the KCDA had no written Brady disclosure policy, no formal rules of behavior governing how cases would be prosecuted and when (if ever) discipline for

---

[19] See http://www.brooklynda.org/wp-content/uploads/2020/07/KCDA CRUReport_v4r3 FINAL.pdf (last visited July 14, 2021).

misconduct would be warranted, and no formal disciplinary system for investigating or disciplining prosecutors who violated the rights of criminal defendants,

219.     While Hynes maintained an Employee Manual governing relatively minor issues such as use of office equipment and time sheets, and penalties for violating those policies, there were no written standards by which prosecutors' conduct during criminal cases would be assessed for discipline, much less any possible penalty that could be imposed.

220.     The KCDA representatives above testified that the KCDA's informal disciplinary "procedure" was for Hynes himself to review all criticisms or complaints about prosecutors. They testified, under oath, that while dozens of court decisions documenting the misconduct of KCDA prosecutors were brought to Hynes' attention, Hynes failed to report the offenders to outside attorney disciplinary bodies.

221.     A list of 27 cases in the three-year period preceding PLAINTIFF'S February, 1992 trial that gave Hynes notice of the need to investigate, supervise, and discipline his prosecutors' and investigators' with respect to their handling of their Brady obligations is attached as Exhibit E, and yet the KCDA representatives testified there was not a single instance in which Hynes directed that any internal disciplinary investigation be conducted, let alone that any discipline be imposed.

222.     To the contrary, KCDA's personnel records establish Hynes and his managerial staff almost invariably gave good evaluations, recommendations, promotions, and pay raises to prosecutors they knew had been alleged or found to have engaged in such misconduct, recommended some of them for judgeships and others for awards, and otherwise ratified the misconduct by aggressively defending it even after it was exposed.

223.     When Hynes received letters from the public or public officials praising his prosecutors, Hynes personally wrote to the prosecutors informing them that he had received the complimentary report and praised the prosecutors. In contrast, when prosecutors' conduct in their handling of a criminal case was criticized, Hynes ignored it, never investigated it, and never confronted the prosecutor about the alleged behavior.

224.     Likewise, while Hynes' complimentary letters would be included in the prosecutors' personnel files, no notation would be made about any of the complaints or evidence of the prosecutors' wrongdoing.

225.     When a court explicitly found that a prosecutor committed misconduct, no record was kept in the prosecutor's personnel file of the finding, or in a central file, making it virtually impossible to

track repeat offenders or to take a prosecutors' behavior into account before transferring the prosecutor to bureaus where the consequences of such misconduct were at their highest.

226.    Despite dozens of court decisions finding prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under Brady, Giglio, Rosario, or statutorily mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, Exhibits D and E, none of the prosecutors involved were ever disciplined.

227.    The KCDA personnel files of the prosecutors in the 64 cases listed in Exhibit D where prosecutorial misconduct was found from between 1989 through 2010 reveal no documentary evidence of disciplinary action ever being taken against the prosecutors, no notations of their misconduct, and Hynes conceded in deposition testimony in the Jabbar Collins case that he took no remedial action with respect to such conduct.

228.    Moreover, prosecutors who courts found to have committed misconduct were placed in supervisory and training positions over new ADAs, essentially ensuring that improper practices would be repeated.

230.    Despite the 64 judicial findings of misconduct, Exhibit A, not once during Hynes' 24 years in office did, he ever terminate a prosecutor for prosecutorial misconduct.

231.     Against this backdrop of the lack of a disciplinary infrastructure, Hynes kept win/loss statistics, making a prosecutor's conviction rate a key factor in his or her ability to advance their careers within the office.

232.    The above policies, customs, and practices, collectively referred to here as the "Hynes Trial Policies," caused PLAINTIFF'S wrongful arrest, prosecution, and conviction.

233.    Several cases handled by Hynes' office during the time period of PLAINTIFF'S arrest and prosecution, and shortly after it,[20] illustrate how Hynes' Trial Policies condoned prosecutorial misconduct.

---

[20] *See Bordanaro v. McLeod, 8*71 F.2d 1151, 11*67 (*1st Cir. 1989) (Post-incident evidence is ... relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *Collins v. City of Ne*w *York,* 923 F.Supp.2d 462, 477 *(*E.D.N.Y. 2013) (Block, J.) (post-incident conduct "might ... reflect a tacit policy on Hynes's part to condone whatever his subordinates deemed necessary to secure a conviction")

234.     Shortly after Hynes KCDA assumed office in January 1990, he defended the wrongful conviction secured by his predecessor in the infamous Waldbaum's Supermarket Fire case in which six New York City firefighters died. Hynes' predecessor convicted a man named Eric Jackson of the purported "arson" that killed the firefighters and convinced the court to sentence Jackson to 25 years to life.

235.     However, the trial court vacated the conviction based on the KCDA's admission that homicide prosecutor Jon Besunder suppressed Brady material from Jackson indicating a fire expert deemed the fire an accidental one, that the Fire Department fabricated the arson to ensure the fire fighters' families received greater death benefits, and that there was evidence that undercut Jackson's confession.

236.     In June 1990, the Appellate Division affirmed the trial court's decision to vacate the conviction based on Besunder's suppression of this devastating Brady material.

237.     Just a month after the Appellate Division's affirmance, Hynes' promoted Besunder to First Deputy Chief of the KCDA Homicide Bureau. Besunder testified at a deposition in the Jabbar Collins case that neither Hynes nor anyone from the KCDA ever questioned him about the Jackson case, or even brought up his conduct in the case before or after promoting him. See Deposition of Jon Besunder in *Collins v. City of New York*, 11 CV 766, April 19, 2013, pp. 136-137.

238.      Following the KCDA's appeal, Jackson's case was remanded for an evidentiary hearing, during which the trial court explicitly found Besunder's testimony at the hearing was "evasive and disingenuous." People v Jackson, 154 Misc.2d 718,722 (Sup Ct. Kings Co. June 12, 1992).

239.     Yet even after this additional finding, Besunder was never questioned, disciplined, or sanctioned. Instead, Besunder continued in his supervisory position and was later appointed Executive DA, training younger ADA on the Riding Program that was designed to, among other things, avoid creating a record of evidence a defendant could use to challenge his case.

240.     In February 1992, the exact month that PLAINTIFF was tried and convicted, Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending the murder conviction his office obtained in *People v. Russ*, 79 N.Y.2d 152 (1992). The case was built on the testimony of two teenage girls who, before trial, recanted their statements to police and to the grand jury. When one of the girls, Ms. Lawrence, testified that she had not seen the defendant commit the crime and then, in the midst of being challenged by the

prosecutor, invoked her Fifth Amendment right against self-incrimination, the following astounding events occurred:

241.     [T]he prosecution interrupted Lawrence's midafternoon testimony and obtained a continuance. Lawrence, then 17 years old, was (1) arrested; (2) charged with perjury; (3) taken in handcuffs crying and frightened to the District Attorney's office; (4) interrogated and threatened with 2 to 7 years in prison; (5) removed to Central Booking for fingerprinting; (6) held until 5:00 A.M., the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 A.M. where she was kept in handcuffs except for her time on the stand. Lawrence's post-arrest and post incarceration testimony, tending to inculpate defendant by describing his role in the mugging, resulted immediately in the perjury charges being dropped. She was only then released from police custody. 79 N.Y.2d at 177.

242.     In reversing the conviction, the Court condemned the "egregious" behavior of the KCDA in "legally coercing Lawrence's testimony." Id. (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience"). That the jury heard what had occurred and could judge the witness's credibility was not adequate," the Court's emphasized.

243.     In the 1993 Ruddy Quezada case, Quezada was convicted based on the testimony as of star witness Sixto Salcedo. During trial the prosecutor portrayed Salcedo as a voluntary witness and had no reason to lie. Years later, however, Salcedo recanted his trial testimony, explaining that he had been arrested on a material witness warrant and held against his will at a hotel by the KCDA. (Civil complaint in *Quezada v. Hynes*, et al., 16 CV 6577 (MKB)(SMG) (Doc. # 1) (E.D.N.Y.), which we incorporate here and in all following paragraphs).

244.     A high-level appellate prosecutor scoffed at Quezada's claims, arguing they were untrue, there was absolutely no evidence to support them, and there was "no copy of a material witness order in the file." The trial prosecutor, who was by then a supervisor in the KCDA, denied any knowledge of the material witness warrant as well.

245.     Years later, when a federal habeas court ordered discovery, the KCDA produced the supposedly non-existent material witness warrant and hotel custody records confirming Salcedo's account. The material witness warrant had been obtained by the very trial prosecutor who had sworn under oath that he had no knowledge of it.

246.     The case was remanded to state court, and Hynes took the position that the KCDA's suppression and misrepresentations regarding the material witness warrant and hotel custody did not constitute a Brady violation or entitle Quezada to any relief.

247.     During discovery in state court, the KCDA turned over an email establishing the appellate prosecutor who had claimed there was no material witness warrant in the file, like the trial prosecutor, had personal knowledge of the warrant long before she made her false representations.

248.     Yet Hynes neither investigated nor disciplined the trial or appellate prosecutors, or acknowledged their conduct violated Quezada's right to due process. Instead, he continued to defend their conduct and the conviction secured through their suppression.

249.     It was not until the new Kings County District Attorney, Kenneth Thompson, came into office that the KCDA finally did the right thing. The KCDA fired the appellate prosecutor and consented to vacatur and dismissal of all charges against Quezada." [21]

250.     But the most egregious and revealing example of the Hynes Trial Policies and Hynes* indifference to such conduct is the case of Jabbar Collins. (Civil complaint in *Collins v. City of New York, et.,* 11 CV 766 (FB)(RML) (E.D.N.Y.) (Doc # 1), which we incorporate here and in all following paragraphs.)

251.     Collins was arrested in 1994 and prosecuted in 1995, shortly after PLAINTIFF was prosecuted and convicted.

252.     In 2006, Collins brought a post-conviction motion documenting, among other misconduct, Brady violations, witness coercion, and the knowing presentation of false evidence and argument by prosecutor Michael Vecchione, then chief of the KCDA's Homicide Bureau, later Hynes' Chief of Investigations, Hynes' close confidante, and one of the prosecutors involved in the initial stages of PLAINTIFF'S case.

253.      Rather than investigate whether Collins' allegations were true, Hynes assigned several attorneys who were direct subordinates of Vecchione and who were second seating him on several high-profile cases to defend Vecchione's conduct no matter how egregious they found it to be.

254.     These prosecutors presented in court a false sworn affirmation by Vecchione denying the allegations which caused Collins' 440 motion to be denied. However, proceedings in Collins' subsequent federal habeas corpus action before the Honorable Dora L. Irizarry, *Collins v. Ercole*, 08

---

[21] The CITY ultimately agreed to pay Quezada $9,000,0000 to settle his civil case asserting, among other things, a *Monell* claim based on Hynes' policies.

CV 1359 (DLI), forced the KCDA to disclose extensive Brady material the KCDA had all along but had withheld from Collins. The disclosure revealed that Vecchione's sworn affirmation, used to defeat Collins' state 440 motion, was perjurious.

255.     Yet Hynes continued to support Vecchione, declared he had done nothing wrong, and held him out as exemplifying the qualities that served as an example to other prosecutors in the office. Ultimately, in granting Collins' habeas petition, dismissing the underlying state indictment, and releasing Collins from custody after 16 years of wrongful imprisonment, Judge Irizarry condemned Hynes and the KCDA for defending the misconduct of Vecchione and other prosecutors in this matter, and for Hynes' failure to properly train, supervise, and discipline his staff.

256.     In the face of those egregious constitutional violations, Hynes' had his prosecutors declare on the record during the June 8, 2010, proceeding before Judge Irizarry (where the KCDA ultimately consented to dismissal of the charges) that:

> "This Office stands behind the conduct of former Assistant District Attorney Posnor and Fisciona and current Assistant District Attorney Vecchione, who prosecuted the defendant at his trial, along with the Office's staff and detective investigators who assisted them[.]"

257.     Within a day of the dismissal, Hynes told media representatives that Vecchione is a "very principled lawyer," was not guilty of any misconduct," and that he would not conduct any investigation into Vecchione's conduct.

258.     Hynes summarily declared that Vecchione would face no disciplinary action. Hynes thereafter promoted Vecchione and continued to praise him. Collins then brought a Monell action against the City based on Hynes policies and ratification of Vecchione's misconduct. The Honorable Frederick Block excoriated Vecchione's conduct and Hynes' failure to investigate it. Yet even after Judge Block's condemnation, which was reported in virtually all major New York newspapers, Hynes did not even read Collins' civil complaint, 440 papers, or habeas petition to review Vecchione's conduct. Deposition of Charles J. Hynes, *Collins v. City of New York*, 11 CV 766 (FBXRML), December 19, 2013, p. 12. Meanwhile, the city ultimately paid Collins $10,000,000 in damages to settle his lawsuit.

259.     Hynes' acquiescence to such misconduct as a matter of policy is also demonstrated by his failure to sanction outrageous misconduct by HALE, a Deputy Bureau Chief at the time, during the 1998 trial of Vladimir Campos, *People v Campos*, 281 A.D.2d 638, 638 (2d Dept. 2001), a potential

death penalty case. During direct examination a key witness blurted out that detectives had coerced him into making a statement incriminating Campos, and that prior to trial he had recanted his statement when meeting with HALE, and later failed a lie detector test. The defense objected that HALE had failed to disclose any of this information and moved for a mistrial.

260.    HALE responded by arguing, in accordance with the Hynes' Trial Policies, that the witness' pretrial recantation was not Brady material because it was not credible."[22]

261.    When the Court asked HALE whether he "had any knowledge of the purported lie detector test," HALE falsely stated to the Court that he did not:

> HALE: No, Judge. I don't recall. I don't have anything in my file about that. The Court knows that I wasn't on this case right from the get-go. I'm not seeing anything in my files that purports to do that." Id. at 442.

262.    But during a hearing on the Brady issue two days later, the KCDA revealed that in truth, HALE himself requested the lie detector test and had personally prepared the questions. Id. pp. 464-465, 476-477. It was also revealed that HALE had affirmatively misstated to the defense that the witness never recanted his story. Id. at 494.

263.    The trial court, the Honorable Carolyn Demarest, found that the pretrial recantation and polygraph test constituted Brady material, that HALE was absolutely without justification" in failing to disclose it, and that HALE'S false representations to the court were 'prosecutorial misconduct." Id. 499. As a sanction, Judge Demarest struck the testimony of the witness in its entirety and gave the jury a curative instruction.

264.    Despite this explicit judicial finding of HALE'S misconduct, HALE was not investigated, sanctioned, disciplined, or in any way penalized for it. HALE maintained his supervisory position in the KCDA, continued to receive promotions, including a promotion to Chief Counsel to Hynes along with a pay raise. Nor was the court's finding of misconduct placed into Hale's personnel file, preventing any successor DA from learning of Hale's misconduct.

265.    The Hynes Trial Policies individually and collectively, caused, permitted, encouraged, or acquiesced in the commission of, constitutional violations of the rights of suspects and defendants by prosecutors, detective investigators, and NYPD detectives working with the KCDA, and

---

[22] Trial Transcript in *People v. Campos*, Kings Co. Ind. No. *790*/98, p. 441

substantially caused HALE'S misconduct at PLAINTIFF'S trial and the violation of PLAINTIFF'S constitutional rights.

266. The foregoing violations of PLAINTIFF'S federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the CITY, amounting to affirmative policies, practices, and customs, and deliberate indifference to the constitutional rights of persons subject to prosecution by the KCDA, and:

    (a) the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

    i. the duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings, including bail hearings, pretrial hearings, and trial;

    ii. the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means;

    the continuing duty to obtain, to preserve, and to make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information;

    iv. the duty to refrain from abusing court process or otherwise coercing or manufacturing false or inherently unreliable statements and testimony from witnesses, and the failure to adequately investigate, instruct, supervise and discipline their employees with respect to such matters, or to rectify such practices.

267. The aforesaid affirmative or de facto policies, procedures, regulations, practices and/or customs were implemented or tolerated by policymaking officials for the CITY, including, but not limited to, Hynes and his delegates, who knew:

48

(a) to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b) that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

(c) that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

268. The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

(a) as noted above, numerous credible allegations, many substantiated by judicial decisions, Exhibits D and E, that ADAs had wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under Brady, had presented or failed to correct false or misleading testimony and argument, and/or had used improper summation arguments,

(b) civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of crime; and

(c) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, recognizing the difficult issues that regularly arise under the Brady rule and the failures of New York City or Brooklyn prosecutors to comply with that rule;

(d) judicial decisions putting the KCDA on notice that the CITY could be held liable for its failure to adequately investigate, supervise, or discipline ADAs regarding their Brady and related due process obligations, including their obligations not to abuse judicial process or coerce false or unreliable statements and testimony, see, e.g., *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dept. 2001), *Leka v. City of New York*, 04 CV 8784 (DAB); Zahrey v. City of New York, et al., 98 Civ. 4546 (DCP*); Collins v. City of New York*, 11 CV 766 (FB) (RML).

269.   Despite this knowledge, the supervisory and policymaking officers and officials of the CITY perpetuated, or failed to take preventative or remedial measures to terminate, said policies,

procedures, regulations, practices and/or customs, did not effectively instruct, investigate or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, as described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the  constitutional rights of residents and citizens of the CITY and the State of New York.

270. The aforesaid policies, procedures, regulations, practices and/or customs of the CITY were collectively and individually a substantial factor in bringing about the violations of PLAINTIFF'S rights under the Constitution and Laws of the United States and in causing his damages.

271. Under the principles of municipal liability for federal civil rights violations, the District Attorney of Kings County (or his authorized delegates) has final managerial responsibility for instructing supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to abuse judicial process, to make timely disclosure of exculpatory evidence or Brady material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

272. Hynes, who was the highest-ranking New York City official with responsibility for setting and enforcing policy with respect to managing his office's personnel and the functions.

273. Hynes, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his office's performance of its duties.

274. Hynes at all relevant times was an elected officer of Kings County, one of the constituent counties of the CITY, and the office was and is funded out of the CITY'S budget.

275. Furthermore, Hynes, as the District Attorney, was and is designated a "local officer," rather than a "state officer," under the *New York Public Officers Law (82)* and are within federal  Monell jurisprudence, *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019); and New York has provided by statute (*N.Y. County Law §§ 53, 941*) that the CITY'S constituent counties (including Kings County), and hence the CITY itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

276. Hynes, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a city policymaker for whom the City is liable, with respect to the above-mentioned areas.

277. During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to PLAINTIFF, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

278. By virtue of the foregoing, the CITY is liable for having substantially caused the foregoing violations of PLAINTIFF'S constitutional rights and his resultant injuries ¶163, above).

**SIXTH CAUSE OF ACTION**

(**Monell/42 U.S.C. § 1983 Claim Against the CITY Based On KCDA's Post-Conviction Policy And Custom Of Covering-Up Trial Prosecutors' Suppression Of Brady/Giglio Material**)

279.    PLAINTIFF repeats the allegations in the foregoing paragraphs and incorporates them here and in all following paragraphs.

280.    Hynes, through his delegated policymakers, including FOIL Appeals Officer , created and implemented a plainly unconstitutional,  improper, and deliberately indifferent policy, custom, or practice that was intentionally designed  and functioned to cover up and perpetuate Brady/Giglio violations committed by KCDA trial prosecutors, and to deprive convicted defendants of their constitutional right to ongoing disclosure of Brady/Giglio material suppressed during their trials (the cover-up policy").

281.    The cover-up policy included,

(a) Responding to convicted defendants' FOIL requests for Brady/Giglio material by restricting the search for such material to the limited records held in the defendants' criminal case files, despite the fact that the KCDA holds such material outside of defendants' case files (e.g. in the Paralegal File, Detective-Investigator Squad, Witness Relocation Unit, Crime Victims Unit, etc.). The KCDA practice of limiting its search in this manner was declared illegal as early as 1996, during the period of  PLAINTIFF'S FOIL requests to the KCDA. See *Collins v. Hynes, Kings Co. Index No. 22973/96*, Decision and Order, Jan. 22, 1997, pp. 7-8 (Sup. Ct., Kings

Co.) (Dowd, J.) (KCDA's search "shall not be limited to respondent's case file in the underlying criminal case, but to any record" in the KCDA's possession. The FOIL "does not limit searches to case files but to records kept by the agency'),

(b) Summarily denying convicted defendants' FOIL requests for Brady and Rosario material when the defendants' trial files did not contain documents literally labeled "Brady" or "Rosario" material, notwithstanding that the records within the file were clearly such material based on their content, and such records were held outside of the defendants' trial files, another practice long ago declared illegal. See *Collins v. Hynes*, at pp. 8-9 (Dowd, J.) (rejecting KCDA's argument that a FOIL request for all Rosario material was insufficient under the FOL, and ruling the KCDA was obligated to disclose all records that contained information constituting Rosario material as defined by *CPL § 240.45*),

(c)  Creating memorandums for inclusion in convicted defendants' FOIL Files to ensure the KCDA's responses to the defendants' FOIL requests are consistent with the trial prosecutors' trial narratives and did not disclose or reveal any information that was not turned over at trial and

(d)  Defending wrongful convictions once they came to light and covering up other's misconduct.

282.   These policies functioned to cover-up Brady/Giglio material suppressed during PLAINTIFF'S and other defendants' trials, appeals, and post-conviction challenges.

283.   For example, in April 1995 Jabbar Collins was convicted of murder and sentenced to 34 and 2/3 years to life in prison. In May 1995, Collins began making FOIL requests to the KCDA for Brady material concerning three key witnesses who then Homicide Bureau Chief Michael Vecchione presented at trial as Good Samaritans who testified against Collins with no undisclosed reason for doing so.

284.   From 1995 to 2008 Collins made a series of FOIL requests to the KCDA attempting to secure documentation proving the prosecutor's trial narrative regarding the witnesses was false, and that they had undisclosed motives for testifying.

285.   Yet in accordance with cover-up policy, the KCDA denied each of those requests on the ground that the Brady material did not exist. When Collins brought state court lawsuits to challenge those denials, the KCDA defeated the lawsuits by affirming to the court that

the records Collins sought did not exist or were not in the KCDA's possession, Likewise, throughout Collins' state court appeals and post-conviction challenges, the KCDA represented the prosecution's trial narrative had been truthful, and that the prosecutor had not suppressed any Brady material.

286.    However, in 2010, discovery was ordered in Collins' federal habeas corpus proceeding, *Collins v. Ercole*, 08 CV 1359 (DLI) and the KCDA was forced to disclose the very Brady/Giglio material the KCDA had for 15 years claimed did not exist, including:

> (a) a Damiani order proving a key witness refused to be produced to the KCDA but was brought there anyway, (b) records showing the witness had been a suspect in a robbery and lied to police immediately before implicating Collins in the crime, (c) a material witness order, warrant and supporting affidavit pertaining to the second witness, showing he had been uncooperative with the KCDA and had to be incarcerated for weeks and forced to testify, (d) an out-of-state material witness warrant pertaining to the third witness, showing the witness had been uncooperative with the KCDA prior to trial, (e) a New York City Probation Department memorandum to KCDA detective-investigators disclosing plans to initiate violation of probation proceedings against that witness, and (f) two letters Vecchione wrote to the New York City Department of Probation on behalf of that witness, resulting in the Probation Department forgoing violation of probation proceedings in light of the witness' cooperation.

287.    Most of these records were located in the KCDA's "Paralegal's File," which the KCDA maintained separate and apart from defendants' trial file.  Shortly after revealing the above records, the KCDA consented to dismissal of Collins' indictment and his immediate release from prison.

288.    The KCDA's withholding of this Brady material in response to Collins' 1995 and later FOIL requests caused him to needlessly spend 15 years in prison.

289.    In May 1995 Gregory Ellis was convicted of murder and sentenced to life in prison. The only witness implicating Ellis in the crime was a drug addict named Richard Rivera, who did not implicate Ellis in the crime until over three weeks after it took place.

290.   At trial and during summation, the prosecutor represented that when Rivera initially implicated Ellis, Rivera had no reason to do so, did not have any open cases, and had no reason for testifying against Ellis at trial.

291.   Over the course of the next 23 years Ellis made numerous FOIL requests to the KCDA for all Brady material in his case, including evidence that contradicted the trial narrative that Rivera was a Good Samaritan.

292.   The KCDA denied each of those requests on the ground that the Brady material did not exist or could not be located. Likewise, throughout Ellis' state court appeals and post-conviction challenges, the KCDA represented Rivera had been truthful, had not committed perjury, and that the prosecutor had not suppressed any Brady material.

293.   Yet in 2020, a new attorney for Ellis made a FOIL request for Rivera's case file and discovered documents establishing, among other things, (a) when police initially brought Rivera to the KCDA for questioning about the murder, he had an open warrant for his arrest in an undisclosed criminal possession of a controlled substance case, faced a year in jail, and faced a possible parole violation that could have put him back in state prison for over a year, (b) after Rivera cooperated  at the KCDA, prosecutors allowed him to remain at liberty without arresting or returning him on the warrant, (c) when Rivera was arrested for a new grand larceny case a year later, Ellis' prosecutor personally intervened in the case and secured Rivera, a predicate felony offender who was still on parole, a favorable bail, and (d) after the prosecutor's intervention, the KCDA offered Rivera a favorable plea bargain.

294.   These records were located in Rivera's case file, which the KCDA never produced because the KCDA maintained these exculpatory records separate and apart from Ellis' trial file.

295.   The KCDA's withholding of this Brady material in response to Ellis' 1996 and later FOIL requests caused him to spend 24 years in prison.[23]

296.   In November 1998 Tasker Spruill was convicted of murder. During his trial, the prosecutor presented Shawn Newton, the star witness against him—who was incarcerated in state prison--- as a Good Samaritan who freely cooperated with the KCDA and testified voluntarily with no undisclosed incentive for doing so.

---

[23] "Ellis' April 15, 2021, *CPL § 440.10* Motion raising these *Brady/Giglio* issues is pending before the Supreme Court, Kings County

297.    Following Spruill's conviction, he filed a series of FOIL requests with the KCDA attempting to secure Brady material proving the prosecutor's trial narrative regarding the witness was false, and that the witness had been coerced into testifying.

298.    For the next 10 years, however the KCDA denied Spruill's FOIL requests on the ground that no such material existed. When Spruill commenced a state lawsuit to challenge the denial, the KCDA defeated it by affirming to the court that it had made a full disclosure of all available material. *Spruill v. Hynes, Kings County Index Number 11036/10*. Likewise, throughout Spruill's state court appeals, federal habeas challenges, and *CPL § 440.10* litigation, the KCDA represented Newton never refused to meet with the prosecutor and testified voluntarily.

299.    Yet 10 years later, the KCDA, faced with a subpoena duces tecum during  litigation of Spruill's *CPL § 440 motion*, disclosed (a) 12 Damiani orders lacking the star  witness' consent to be produced to the KCDA, (b) a Damiani order memorializing the witness'  explicit refusal to be transferred to the KCDA to meet the prosecutor, and (c) several orders to produce, issued upon false affirmations and used to produce Newton to the KCDA over 20 times.[24]

300.    The KCDA also revealed a secret material witness order demonstrating the KCDA had custody of another witness the prosecutor had falsely represented might disappear if the court did not permit her to testify that day.

301.    These undisclosed Damiani orders, orders to produce, and the material witness order were maintained in the KCDA Detective-Investigators Squad, separate and apart from the defendant's trial file.

302.    On March 27, 2017, the 440-court vacated Spruill's conviction on coercion, Brady, and false testimony grounds, finding the records should have been disclosed to the defense. [25]

303.    The KCDA's cover-up policy in defending wrongful convictions once they came to light, and prosecutors covering up each other's misconduct, is further demonstrated by the conduct of

---

[24] The witness' correction records revealed that when correction officials executed one of those orders to produce, the witness attempted to kill himself in his prison cell but was forced to be produced to the KCD*A* anyway.

[25] The Appellate Division reversed, concluding, among other things, that the non-disclosure was not material. *People* v S*pruill, 1*64 A.D.3d 1270 (2d Dept. 2018).

Hynes and eight members of his executive staff once the extent of Hynes' wrongful convictions became public.

304.     As each of those officials would admit to the New York City Conflict of Interest Board, they each violated *New York City Charter § 2604*, conduct constituting a Class A misdemeanor (misusing City resources),[26] in their efforts to assist Hynes in defending against attacks focused on the scores of men he wrongfully convicted.

305.      Hynes and his executives never reported each other's misconduct and violations of their oaths of office, but rather collectively took part in this outrageous conduct. Even after Hynes' executives admitted to committing these acts, Hynes publicly declared they did nothing wrong.[27]

306.     The cover-up policy is also demonstrated by Executive DA, Dino Amoroso's actions in pressuring an ADA to sign a false declaration to cover-up evidence that prosecutors had been trained to suppress Brady material. ADA Barbara Burke was assigned to compile KCDA records responsive to the PLAINTIFF'S discovery demands in the Jabbar Collins lawsuit. One of those demands sought any recordings and attendance sheets of a KCDA training session conducted by Michael Vecchione and the Sex Crimes Bureau Chief during which ADAs were instructed that

---

[26] *R.A.C. Group v Board of Educ. of City of New York,* 21 A.D.3d 243, 247-248 (2d Dept 2005)("A person who violates New York City Charter $ 2604 is guilty of a misdemeanor, and forfeits his or her public office or employment upon conviction[:]'); *Penal Law § 55.10 (2)(b)* (providing any misdemeanor defined outside of that statute without specification shall be deemed a class A misdemeanor"); *NY Penal Law.§ 70.15 (1)* (authorizing a one year sentence for an A misdemeanor). Hynes and his executive staff each admitted in detailed stipulations to the New York City Conflict of Interest Board that between 2012-2013, they violated *§ 2604 of the New York City Charter* by using CITY resources, time, or equipment to help Hynes in his effort to win reelection (by fending off criticism of his wrongful convictions). Hynes was fined $40,000 (the highest fine in NYC history for such conduct), Amy Feinstein, Chief Assistant District Attorney ($4,500 fine), Dino Amoroso, Deputy District Attorney ($4,500 fine), Henna White, Community Liaison to Orthodox Jewish Community ($4,000 fine), Anne Swern, First Assistant District Attorney ($2,000 fine), Lance Ogiste, Counsel to Hynes ($1,000 fine), Michael F. Vecchione, Chief of the Rackets Division ($1,000 fine), Marc Fliedner, Executive Attorney ($800 fine), and Mary Hughes, Confidential Assistant District Attorney ($600 fine).

[27] This complimented Hynes' creation of a conviction review panel that had *the appearance* of independence, but which was really designed to whitewash Hynes' wrongful conviction scandal. Hynes appointed Robert G.M. Keating, one of Hynes' closest friends and a man he would jog with on a daily basis, to lead the supposedly "independent" review panel.

Brady material that was not memorialized —sex crimes victims' pretrial denials or recantations did not have to be disclosed to the defense.

307.    When ADA Burke raised concerns about the KCDA's failure to disclose those records, Amoroso, Hynes' close friend, demoted ADA Burke from her executive position to the KCDA's Early Case Assessment Bureau, a position typically reserved for young, inexperienced ADAs joining the office.

308.    In August 2013, shortly after that demotion, Amoroso instructed ADA Burke to execute a declaration in the Jabbar Collins case representing she had no knowledge of the training session or the attendance sheet. After securing Burke's declaration, Hynes fired her.

309.    ADA Burke decided to speak out and reported to the FBI that Amoroso had pressured her into signing the declaration. In April 2014 she also wrote to Magistrate Judge Richard M. Levy, who was handling discovery in the Collins case, explaining that "Amoroso instructed [her] to sign" the misleading declaration, and revealed that the instructional DVD of the training session actually existed, as well as the attendance sheet generated in connection with the training session. Doc #176, Docket Sheet in *Collins v. City of New York*, 11 CV 766 (FB)(RML)."[28] The CITY later disclosed the supposedly non-existent attendance sheet to the PLAINTIFF.

310.    Pursuant to the cover-up policy, the KCDA denied each of PLAINTIFF'S FOIL requests for Brady material suppressed throughout his criminal trial on the grounds that the requested material did not exist or could not be located when in fact, those records were held by the KCDA in and outside of PLAINTIFF'S trial file.

311.    The KCDA's cover-up policy prolonged PLAINTIFF'S unjust loss of liberty, continued his unjust incarceration, and deprived him of his constitutional rights to:

(a) Continuing disclosure of Brady and Giglio material suppressed by the State during his criminal trial, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments,

(b) The ongoing obligation of the State to correct materially false or misleading evidence that caused the defendant's wrongful conviction in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments,

---

[28] Frances Robles and Vivian Yee*, A New Dispute Emerges in Brooklyn Prosecutor's Office,* New *York Times,* Nov. 22, 2013, p. 21 (https://www.nytimes.com/2013/11/23/nyregion/a-new-dispute-emerges-in-brooklyn-prosecutors-office.html) (last visited June 25, 2021).

(c) To not be maliciously prosecuted, and to have that prosecution continued, in violation of the Fourth and Fourteenth Amendments, and

(d) To not be deprived of liberty as a result of the fabrication of evidence by government officers acting in an investigative capacity, in violation of the Due Process Clauses of the Fifth, Sixth and Fourteenth Amendments, *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000).

312.   At relevant times above, Hynes, was the chief executive of the KCDA.

313.   As a matter of New York law, Hynes, as the head of the KCDA, was the FOIL Appeals Officer for the KCDA, or the individual they designated for that purpose. See *Public Officers Law § 89 (4) (a)*.

314.   The FOIL explicitly authorized Hynes to designate a subordinate as the Appeals Officer. *Public Officers Law § 89 (4) (a)* (Hynes or his designee); *43 Rules of the City of New York § 1-02* ("The head or governing body of each agency ... shall designate one or more persons as records access officer or officers to coordinate the agency's response to public requests for inspection and copying of records.")

315.   In or around 1990 Hynes designated Melanie Marmer as the FOIL Appeals Officer for the KCDA, who served in that role from 1990 to at least 2001.

316.   During that time, Marmer established all FOIL policies, procedures, and practices for the KCDA.[29]

317.   No CITY official had veto power over Marmer's FOIL decisions and policies, and they were completely insulated from further municipal review.

318.   Marmer's policies, acts, and/or omissions, at the time they were made, for practical and legal reasons were the CITY'S final decisions on the matters to which they pertained. *Public Officers Law § 89 (b)* ("[A] person denied access to a record in an appeal determination ... may bring a proceeding for review of such denial pursuant to article seventy-eight of the civil practice law and rules."); *43 Rules of the City of New York § 1-06 (d)* (deeming Appeals Officer's decision final and requiring him or her to inform requesters of their right to seek judicial review of that decision).

---

[29] There is deposition testimony from Marmer to this effect. *See* Deposition of Melanie Marmer in *Collins v. City of New York*, 11 CV 766 (FB) (RML), July 22, 2013.

319.    Marmer, as the CITY official in charge of the KCDA's administration and compliance with the FOIL, and the municipal official who had the last word and ultimate say on the handling of FOIL requests made to the KCDA, had final policymaking authority concerning:

> Which KCDA files would be searched in response to convicted defendants' FOIL requests seeking access to Brady material, Rosario material, and other records regarding their cases,
>
> The procedure for reviewing and responding to convicted defendants FOIL requests seeking such materials, and
>
> Responding to, granting and/or denying convicted defendants' FOIL requests seeking such materials.

320.    Marmer and/or her predecessor, exercising that policymaking authority, promulgated, established, enforced, and instructed all KCDA Records Access Officers to follow the policies discussed above, and the KCDA's Records Access Officers followed those policies, or pre-existing policies that Dennehy adopted and ratified, in denying each of PLAINTIFF'S FOIL requests.

321.    The cover-up policy damaged PLAINTIFF as set forth above, including in ¶163.

## SEVENTH CAUSE OF ACTION

### (Monell/42 U.S.C. § 1983: Claim Against the CITY based on the conduct of the NYPD)

323.    PLAINTIFF repeats the allegations in the foregoing paragraphs of this Complaint and incorporates them here and in all following paragraphs.

324.    The foregoing violations of PLAINTIFF'S federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the CITY amounting to deliberate indifference to the constitutional rights of persons, including PLAINTIFF who are investigated, arrested, or prosecuted for alleged criminal activities.

325.    Prior to PLAINTIFF'S arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning ;

> (a) The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts,

and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

(b) The determination of probable cause to make an arrest; and

(c) The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (Brady material) favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witness has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under Brady.

326.    With respect to "a" and "c" in the preceding paragraph, prior to PLAINTIFF'S 1990 arrest and prosecution, the NYPD provided no training at all. [30]

327.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the CITY, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

(a) To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b) That such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the

---

[30] Deposition testimony from present and former police detectives, including supervisors, during several civil rights lawsuits, including *Zahrey v. City of New York, et al.,* 98 Civ. 4546 (DLP) (S.D.N.Y.), establishes, prior to and during the time period of PLAINTIFF'S 1993 arrest and prosecution, the NYPD provided no training concerning appropriate interrogation of accomplice or informant witnesses and *Brady* compliance. Most such witnesses had no idea what "*Brady"* was and no clue about their obligation to comply with it.

need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

(c) That the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury,

328.  The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of PLAINTIFF'S constitutional rights beginning with his false arrest and the initiation of a criminal prosecution against him without probable cause and continuing throughout his criminal proceedings, trial and incarceration

329.  The policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, and the need to investigate and supervise officers by, among other circumstances:

a) Credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony;

(b) Fifty civil lawsuits, from 1990 to 2000 (Exhibit F), some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause;

(C)Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under Brady as well as the probable cause requirement of the Fourth Amendment;

(D) Judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their Brady obligations and for failing to adopt adequate Brady disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the CITY could be held

liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under Brady, see *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter y, Harrison*, above;

(e) Formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the NYC Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

(F) The inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

330.     Evidence that the NYPD, in 1990-1993, had notice, and policies and customs of, deliberate indifference to police misconduct, including the coercion of false or misleading statements, fabrication of evidence, and withholding information favorable to the defense, is evidenced by The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission"), dated July 7, 1994.

331.     The Mollen Commission report, which was being compiled during the time of PLAINTIFF'S arrest and prosecution, establishes that:

In the face of the[e] problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out .... Thus, there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision to investigations, police culture, training, and recruitment.

332.     For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it. *Mollen Commission Report, p. 2-3.*

333.    Other circumstance and government reports put the CITY on notice as well regarding the need to investigate, discipline, and supervise its police officers:

(a) In 1990, the Office of Special Prosecutor, which investigated charges of police corruption, was abolished.

(b) The Mollen Commission concluded police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system:

... Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them,

... What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that nothing is wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" - doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty." *Mollen Commission Report, p. 36, 40-41.*

334.    Furthermore, since at least 1984, well before SPOTO and his codefendants framed PLAINTIFF in 1990, the CITY and the NYPD were on notice of the inadequacy of its training, supervision, and discipline policies, and that police officers joining the force were disproportionately involved in the same type of misconduct and abuse as in PLAINTIFF'S case. *See e.g., Mayor's Advisory Committee on Police Management and Personnel Policy, Final Report, February 24, 1987.*

335.    The city policymakers were on notice in 1990-1993 of the lack of supervision and discipline of NYPD officers by virtue of:

(a) The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations;

(b) Prior to July 1993, the Civilian Complaint Review Board ("CCRB"), which is responsible for receiving and investigating complaints of police misconduct made by citizens against members of the NYPD, operated as an agency of the NYPD rather than as an independent, unbiased entity;

(c)  During the 1980s, the early 1990s, and in and around the time frame of the token clerk's murder investigation in PLAINTIFF'S case, the CCRB received numerous complaints of police misconduct, but failed to fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously minuscule number of cases;

(d) On average, in 1990-1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated only 3.3 percent of the total complaints received;

(e)  The CCRB has also failed to recommend disciplinary action in the vast majority of its cases;

(f) On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases;

(g) Moreover, most of the complaints that are substantiated by the CCRB did not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 80 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90-day suspension;

(h) Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out-of-court settlements or judgments in civil actions. Meanwhile, on average, only about 107 complaints were substantiated annually by the CCRB in 1988-1992;

(i) The money paid out by the city in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994;

(j) More than $82 million was paid in damages to victims of police misconduct in 1,352 cases between 1990 and 1995;

(k) In the vast majority of police misconduct cases that result in verdicts or substantial settlements for victims, the CITY imposed no discipline, either before or after resolution in court, almost never reopened an investigation previously conducted after such resolution, and sometimes promoted the abusive officer to a position of greater authority despite the. judicial resolution, and

(l) Former New York City Police Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way." [31]

336.   The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of PLAINTIFF'S constitutional rights beginning with his false arrest and the initiation of a criminal prosecution against him without probable cause, and continuing throughout his criminal trial, conviction, and incarceration.

337.   Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, the use of only truthful evidence, and the disclosure of Brady material.

338.   The Police Commissioner, personally and/or through his authorized delegates, at all relevant times bad final authority and constitutes a CITY policymaker for whom the CITY is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

---

[31] *Accord* Amended Civil Complaint in *Negron v. City of New York,* 18 CV 6645 (DG) (RLM) (S.D.N.Y.) (Doc. #1) at IT 213-373, incorporated here by reference (detailing numerous additional instances of police misconduct which provided the NYPD with notice of its officers' misconduct, and establish the NYPD's policy of acquiescence and ratification).

339.     During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to PLAINTIFF, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training, supervision and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects.

340.     The aforesaid policies, procedures, regulations, practices and/or customs of the CITY and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by SPOTO, FISCH and FALCONE of PLAINTIFF'S rights under the Constitution and laws of the United States.

341.     By virtue of the foregoing, the CITY is liable for PLAINTIFF'S damages (¶163).

### NINTH CAUSE OF ACTION
**(42 U.S.C.§1983 Civil Conspiracy, Concerted Action, Aiding and Abetting; SPOTO, FISCH, FALCONE and the CITY)**

342.     PLAINTIFF repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint and incorporates them here and in all following paragraphs.

343.     SPOTO, FISCH and FALCONE all explicitly and/or implicitly corruptly agreed to commit with each other and/or other unnamed conspirators, the wrongs detailed above, and to ultimately have PLAINTIFF falsely arrested, prosecuted, convicted, and to cover-up each other's misconduct.

344.     Each defendant then committed overt acts, as detailed above to accomplish the goal of the conspiracy, including, but not limited to (a) framing and falsely arresting and prosecuting PLAINTIFF of the murder, and (b) covering-up those actions and the Brady/Giglio material that undermined the case against PLAINTIFF.

345.     By virtue of the foregoing, defendants conspired to deprive PLAINTIFF of his constitutional rights to:

> (a) Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (recognizing "right not to be deprived of liberty

as a result of the fabrication of evidence by a government officer acting in an investigating capacity");

(b) Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, and

(C) To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland, 373 U.S. 83 (1963)*, *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

346.    SPOTO, FISCH and FALCONE committed the foregoing violations of PLAINTIFF'S constitutional rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to them, or to the effect of such misconduct upon them,

*347.*    By reason of the foregoing, those defendants are liable to PLAINTIFF pursuant to *42 U.S.C. § 1983*, for compensatory and punitive damages detailed in [¶163, above.

348.    The CITY is liable for these wrongs by virtue of (a) Hynes' and the NYPD's deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here, and (b) a CITY policymaker's (the KCDA FOIL Appeals Officer) direct participation in the civil conspiracy to continue and cover-up PLAINTIFF'S wrongful and malicious arrest, prosecution, and conviction. See -¶¶207-341, infra (Monell claims against the CITY).

349.     The defendants acted with a deliberate indifference to, and failure to train, supervise, and discipline employees regarding, such practices despite the awareness of the likelihood that his failure to do so would result in the injuries pled herein.

## TENTH CAUSE OF ACTION

### (Malicious Prosecution Under New York Law; All Defendants)

350.    PLAINTIFF realleges each and every allegation contained in the foregoing paragraphs of this Complaint and incorporates them here and in all following paragraphs.

351.    By virtue of the foregoing, SPOTO, FISCH and FALCONE, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against PLAINTIFF.

352.    The criminal proceedings terminated in PLAINTIFF'S favor.

353.    There was no probable cause for the commencement or the continuation of the criminal proceedings.

354.    The Defendants acted with actual malice.

355.    Defendants the CITY is liable for these wrongs under the principle of respondeat superior, and for the damages set forth in 163, above.

## ELEVENTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress Under New York Law; All Defendants)

356.    PLAINTIFF realleges each and every allegation contained in the foregoing paragraphs   of this Complaint and incorporates them here and in all following paragraphs.

357.    Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at PLAINTIFF from October 27, 1990, until his release from prison on December 16, 2009.

358.    Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, PLAINTIFF severe emotional distress.

359.    Specifically, defendants, individually, acting in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, coerced witnesses into making false statements to be used against PLAINTIFF, created false official records to be used against PLAINTIFF, initiated or caused the initiation and continuation of false and unfounded criminal charges against PLAINTIFF while lacking probable cause to do so, suppressed Brady and Giglio material, and lied to prosecutors, courts, and the jury at PLAINTIFF'S trial,

360.    As a result, PLAINTIFF suffered severe emotional distress that was proximately caused by the defendants' conduct.

361.    By virtue of the foregoing, PLAINTIFF suffered the actual damages identified in ¶163.

## TWELFTH CAUSE OF ACTION

### (False Arrest Under New York Law, All Defendants)

362.     PLAINTIFF realleges each and every allegation contained in the foregoing paragraphs of this Complaint and incorporates them here and in all following paragraphs.

363.    SPOTO, FISCH and FALCONE intended to and in fact did, confine PLAINTIFF.

364.    PLAINTIFF was aware of his confinement.

365.    PLAINTIFF did not consent to his confinement.

366.    The confinement was not supported by probable cause or otherwise privileged.

367.    Defendants the CITY is liable for these wrongs under the principle of respondeat superior, and for the damages set forth in ¶163.

### THIRTEENTH CAUSE OF ACTION

**(New York State Constitutional Due Process Claim Against The CITY Pursuant To Respondent Superior; Buari v. City of New York, 2021 WL 1198371 (S.D.N.Y. 2021))**

368.    PLAINTIFF realleges each and every allegation contained in the foregoing paragraphs of this Complaint and incorporates them here and in all following paragraphs.

369.    SPOTO, FISCH and FALCONE , by virtue of their acts and omissions detailed above, violated PLAINTIFF'S rights under the Due Process and Equal Protection provisions of the New York State Constitution (a) to be free of unlawful arrest not based on probable cause, (b) to not have a government officer acting in an investigating capacity fabricate evidence against him, (c) to due process of law, (d) to a fair trial, (e) to not be convicted based on false or misleading evidence and argument, and suppression of Brady material, and (f) to not be incarcerated without probable cause.

370.    As a direct and proximate result of these defendants' acts and omissions, PLAINTIFF was wrongfully arrested, prosecuted, convicted, and imprisoned for 19 years and 2 months, and suffered other grievous and continuing injuries set forth above.

371.    The CITY is liable under respondeat superior for the acts and omissions of SPOTO, FISCH and FALCONE, within the scope of their employment, for PLAINTIFF'S damages ¶163.

**WHEREFORE**, PLAINTIFF demands judgment against defendants as follows:

(a) For compensatory damages of not less than $75,000,000;

(b) For punitive damages against the individual defendants of $50,000,000;

(c)  For reasonable attorneys' fees, together with costs;

(d) For pre-judgment interest as allowed by law; and

(e)  For such other and further relief as this Court may deem just and proper.

DATED: August 19, 2023
      New York, New York

_____    s/Oscar Michelen_____
OSCAR MICHELEN
*Attorney for Emel Mcdowell, PLAINTIFF*
CUOMO LLC
200 Old Country Road
Suite 2 South
Mineola, NY 11501
Phone:516-741-3222
omichelen@cuomollc.com
