

# DISTRICT ATTORNEY
# KINGS COUNTY

## DISTRICT ATTORNEY ERIC GONZALEZ

REPORT ON THE CONVICTION

OF

EMEL MCDOWELL

By: The Conviction Review Unit

March 2023

## THE CRIME AND BACKGROUND

According to the trial testimony of two witnesses, on October 27, 1990, at approximately 12:25 a.m., in the courtyard of 671 Gates Avenue, 17-year-old defendant shot 19-year-old Jonathan Powell ("the deceased") once in the chest, killing him.

In 2009, defendant was granted a hearing on a motion, pursuant to C.P.L. § 440.10, to vacate his judgment of conviction of Murder in the Second Degree, based on, among other claims, a claim of newly discovered evidence—that another individual ("JD") shot and killed the deceased.

Before the hearing commenced, defendant accepted the People's offer to vacate the murder conviction in exchange for a plea of guilty to Manslaughter in the First Degree, under an acting in concert theory, and a sentence resulting in his immediate release from prison. Defendant allocuted that JD shot the deceased while defendant and another (unnamed), both armed with handguns, confronted the deceased.

Defendant is at liberty.

## OVERVIEW OF THE ERRORS

CRU determined that defendant's conviction, pursuant to the plea of guilty to first-degree manslaughter, should be vacated and the indictment dismissed. Among other reasons: (1) (a) CRU confirmed that JD was the shooter in that JD confessed to CRU, and (b) CRU learned from JD that defendant was not armed at the time of the shooting and CRU found no other evidence to confirm that defendant acted in concert with JD; (2) the one-day police investigation was inadequate; and (3) trial counsel failed to investigate compelling information he possessed that JD was the shooter.

## THE POLICE INVESTIGATION[1]

The one-day investigation commenced shortly after the shooting and ended with defendant's arrest. Christopher Spoto from the 79th Precinct was the lead detective, assisted by Brooklyn North Homicide Det. Horst Fisch.

### The Responding Officers

On October 27, 1990, at approximately 12:25 a.m., multiple 911 callers reported shots fired in the vicinity of Gates Avenue between Throop Avenue and Marcus Garvey Boulevard, and a male shot in in the rear of 671 Gates.[2] Officers Michael Prate and Brian Hurley were in the area and heard the gunshots. People ran toward the officers saying, "They were shooting at the party." The officers

---

[1] Unless otherwise stated, the police investigation facts are obtained from the documents in the People's trial file and the precinct's original detective file. Numbers in parenthesis preceded by "H." refer to the pages of the pretrial hearing; those preceded by "T." refer to the pages of the trial transcript' those preceded by "S." refer to the pages of the sentencing transcript; and those preceded by "P." refer to the pages of the plea proceeding.

[2] NYPD sprint printout. An anonymous male caller reported hearing four shots.

observed several males carry the deceased out of the courtyard from behind 671 Gates.[3] Troy Coutrier told the officers that he had been shot in the leg.[4]

At 1:20 a.m., the deceased was pronounced dead at Kings County Hospital.[5]

**No Relevant Forensic or Ballistic Evidence Was Recovered**

Crime Scene Unit ("CSU") recovered samples from various locations at the scene. The samples that Office of Chief Medical Examiner tested did not match the deceased. No ballistics evidence was recovered.

The deceased's shirt was tested for the presence of gun powder burns. Gun powder residue was found around the bullet hole on the front of the shirt. The muzzle to target distance could not be determined without the gun, which had not been recovered.[6]

**The Interviews (all conducted on October 27)**

<u>Troy Coutrier</u>

Dets. Spoto and Fisch interviewed Coutrier at Brookdale Hospital (time not provided). Coutrier stated the following:

He was at a party with his friends, defendant and JD, who resided at 592 and 574 Greene Avenue, respectively. Several males started beating him. The fight continued outside, and he was shot in the leg.[7]

<u>Duwan Moore</u>

At approximately 1:10 a.m., Dets. Spoto and Daniel Carmosin responded to Kings County Hospital (regarding the deceased). They subsequently spoke with Duwan Moore, the deceased's cousin. Moore stated that he did not see what happened. He was driving by when he heard gunshots. He stopped and learned about the shooting.[8]

---

[3] Spoto DD5, "Interview of PO Prate"; Patrol Supervisor, 79th Precinct memo to Chief of Patrol, "Two Males Shot, One DOA Within the Confines of the 79th Precinct" ("Patrol Supervisor Memo").

[4] Patrol Supervisor memo.

[5] *Id.*; Unusual Occurrence Report; Patrol Supervisor memo.

[6] Police Laboratory Analysis Report, 2/10/92

[7] Spoto DD5, "Interview of Compl."; *see also* Complaint Report #15557 (stating that Coutrier appeared to be intoxicated during the interview) The deceased's and Coutrier's shootings were initially believed to unrelated incidents and written up under different complaints.

[8] Spoto DD5, "Interview of Duwan Moore." Witnesses placed Moore at the scene. (*see* below) Moore later denied his statement to the detectives. (*see* CRU Investigation)

Attempt to Interview Defendant

At approximately 10:15 a.m., Det. Spoto went to defendant's home to interview him as a witness. Defendant's stepfather, Earl Rogers, said defendant did not return home from the prior night. He said he would have defendant contact Spoto.[9]

JD

At approximately 10:25 a.m., Det. Spoto interviewed JD at his residence. JD stated two guys jumped "Troy" (Coutrier) at the party. Everyone ran outside. JD ran around the corner and saw an ambulance.[10]

Divine Thomas

At approximately 11:20 a.m., at the 79th Precinct, Det. Spoto interviewed 14-year-old Divine Thomas. Thomas stated the following:

At Jessica's party a boy (Coutrier) started "mushing" him in the face (pushing his face). Thomas made a fist, and two other boys asked why he was "flexing up." One of them pushed Thomas. The deceased, Thomas' cousin, approached and fought with the boys.[11]

The fight was broken up, and Thomas and the deceased went outside where several boys approached them. One of the boys—whom Thomas later identified as defendant—pointed a gun at Thomas. The deceased pushed his way in front of Thomas. Defendant "put the gun on [the deceased] and shot him."

Defendant pointed the gun at Thomas again. Everyone started running. Someone pushed defendant's hand into the air, and he fired a shot. Thomas ran and heard more shots. The deceased collapsed. Thomas and the deceased's friends carried the deceased from the courtyard.[12]

*Divine Thomas' Sworn Audiotaped Statement*

Later, (at approximately 1:25 p.m.) at the 79th Precinct, Thomas made a sworn audiotaped statement to an ADA.[13] Dets. Spoto and Fisch were present. Thomas's statement was consistent with his prior statement. He added the following:

Jessica Brown and her sister Tanya had the party in the community room in their building. One of the boys who pushed Thomas in the face said, "you better know me." Thomas never saw these boys before. He heard they were from Nostrand Avenue.

---

[9] Spoto DD5, "Attempt to Interview Witnesses at 592 and 574 Greene Ave."

[10] Spoto DD5, "Attempt to Interview Witnesses at 592 and 574 Greene Ave."

[11] Although no identification procedure was conducted with Coutrier, it is not disputed that he pushed Thomas in the face and the deceased fought with Coutrier. For the sake of clarity, this boy will be referred to as Coutrier.

[12] Spoto DD5, "Interview of Divine Thomas, M/B 14, 12/20/75 . . ."

[13] Audiotape A90-2117 and accompanying transcript.

When the deceased arrived and learned what happened he had Thomas point out Coutrier. The deceased confronted Coutrier and fought with him.

After the deceased and Thomas went outside, a group of boys, including defendant, came out. Defendant pulled out a gun. The others were "trying to hide [defendant] because they was [sic] going to shoot [Thomas]." When the deceased stepped in front of Thomas, defendant placed the gun on the deceased's chest and shot him. Defendant was right in front of Thomas and the deceased. Defendant did not say anything before or after the shooting.

Thomas only saw defendant with a gun. Thomas never saw defendant before, including at the party. After the deceased was shot, he ran after defendant saying, "I'm gonna get you." The deceased collapsed in the tunnel between the buildings. Thomas heard gunshots and someone run past them shooting.

Shamik Graham

At approximately 11:40 a.m., at the 79th Precinct, Det. Fisch interviewed Shamik Graham, who stated the following:

He arrived at the party at about 10:00 p.m. and joined "D" (Divine Thomas) and others. At around 11:00 p.m., a black male wearing a black "Orlando" jacket (Coutrier), pushed Thomas in the face saying, "You better recognize me." Thomas backed away.

The deceased came in and asked Thomas what had happened. The deceased confronted Coutrier. Coutrier replied, "You better recognize me," and "put his hands in the deceased's face." The deceased pushed Coutrier and a fistfight ensued. A friend of the deceased's joined in and beat up Coutrier. The lights then went out. Someone waved a gun, and people left. About five minutes later, still inside, Graham heard gunshots from outside the community center. He went outside and saw the deceased had been shot.[14]

*Shamik Graham's Sworn Audiotaped Statement*

Later, (at approximately 2:25 p.m.), at the 79th Precinct, Graham gave a sworn audiotaped statement to an ADA.[15] Det. Fisch was present. Graham's statement was consistent with his prior statement. He added the following:

Graham did not know the "kid" who put his hand in Thomas' face (Coutrier) but would recognize him if he saw him again. Thomas told his godbrother Duwan (Moore) what had happened. Moore went to speak to Coutrier but did not find him. Moore said to wait for the deceased. When the deceased arrived, they told the deceased what had happened, and the deceased beat up Coutrier.

After the lights went out, "this kid" pulled out a gun, and Graham jumped behind a wall. When the lights came back on, people came in saying that the deceased had been shot. Graham heard the gunshot. He did not see the shooting.

---

[14] Fisch DD5, "interview of Shamik Graham."

[15] Audiotape A90-2187 and accompanying transcript.

Danny Blackman

At approximately 11:50 a.m., at the 79th Precinct, Det. Spoto interviewed Danny Blackman. Blackman stated the following:

He left Jessica's party to go to the store. When he returned, his friends were on one side of the room and the "boys from Nostrand" on the other. Some boys came over and started pushing Wayne, "a little boy."[16] Wayne said he did not want problems. The boys then pushed "D" (Devine Thomas) in the face. Thomas cried and looked for the deceased.

The deceased came in and asked what happened. Thomas pointed to the boy, who was later shot in the leg (Coutrier). Coutrier and the deceased starting fighting. The deceased pushed Coutrier to the ground and stomped on him. Moore grabbed the deceased and told him it was not necessary.

The other boys with Coutrier ran outside. The deceased ran after them yelling, "I got to ask you a question." Defendant, (whom Blackman referred to as Emel), and two of the boys pulled out guns. Defendant pointed the gun at Thomas and the deceased jumped in front of Thomas. Defendant fired. The deceased stumbled. The other boys ran and started shooting. The deceased chased them and collapsed.

Coutrier came outside laughing that the deceased had been shot. A friend of the deceased's shot Coutrier in the leg. Blackman told Spoto that he could not identify the person who shot Coutrier in the leg.[17]

*Danny Blackman's Sworn Audiotaped Statement*

Later, (at approximately 1:55 p.m.), at the 79th Precinct, Blackman made a sworn audiotaped statement to an ADA.[18] Dets. Spoto and Fisch were present. Blackman's statement was consistent with his prior statement. He added the following:

Defendant was one of the Nostrand guys who pushed Wayne's head back. Blackman knew defendant for two to three years. They went to the same junior high school and spoke to each other. Blackman also knew defendant from the neighborhood, mostly seeing him in the summer. Blackman did not know defendant's last name, where he lived, or his age.

Moore was Thomas's godbrother. The deceased fought someone from Nostrand Avenue dressed in a black Magic jacket (Coutrier).[19] Moore broke up the fight.

Then many Nostrand boys ran out the door. The deceased ran out behind them saying, "Yo, I want to ask one of y'all a question." Blackman ran outside with the deceased, Thomas, and two friends of the deceased, whom Blackman did not know.

---

[16] Wayne's last name is unknown.

[17] Spoto DD5, "Interview of Danny Blackman M/B 18 [address, phone]"

[18] Audiotape A90-2188 and accompanying transcript.

[19] Shamik Graham described an "Orlando" jacket. (*see* above) "Orlando Magic" is a basketball team in Orlando, Florida.

The deceased asked the Nostrand boys, "Why y'all running?" Defendant and two boys, who had pushed Wayne and Thomas, turned and pulled out guns. The other Nostrand boys ran out the gate (onto the street). The deceased asked why they were pulling out guns "over something stupid."

One of the armed boys with defendant asked defendant, "What you want to do?" Defendant pointed his gun at Thomas, the deceased jumped in front of Thomas, and defendant fired hitting the deceased in the chest. Blackman was behind Thomas and the deceased at the time and faced defendant and his friends. After defendant fired, the other two armed boys fired shots in the air.

The deceased chased the boys and collapsed at the tunnel. Courrier, who was inside during the shooting, came out, bleeding from his mouth. One of the deceased's armed friends, who was wearing a tan coat and black hoodie said, "Here go[es] one of [the defendant's] friends," and shot Courrier in the leg.

Defendant's _Mirandized_ Statement to Spoto

A approximately 3:10 p.m., defendant voluntarily went to the 79th Precinct. Det. Spoto _Mirandized_ him. Defendant made the following statement:

He was sitting in the back of the community center when "Lateek" told defendant "they" were beating up Courrier. When defendant went outside, he heard a shot, and everyone ran. He grabbed Nicole Martin's hand, and they ran down Gates Avenue. When they reached Tompkins Avenue, they saw defendant's mother and defendant told her they were shooting at the party. They returned to the scene and heard that Courrier and the deceased had been shot. Defendant further stated that he saw a brown-skinned boy with a gun.[20]

Lawrence Lackey

At approximately 3:25 p.m., at the 79th Precinct, Det. Spoto interviewed Lawrence Lackey. Lackey stated that he went to the party with defendant, JD, and Courrier. "A bunch of guys" beat up Courrier. Everyone ran outside. The deceased was taking off his jacket as if he was preparing to fight, when he was shot. Lackey did not see the shooting. He was near defendant and defendant's girlfriend at the time. Defendant did not shoot the deceased. Lackey asked defendant who shot the deceased. Defendant said he did not know.[21]

Nicole Martin

At approximately 4:30 p.m., at the 79th Precinct, Det. Spoto interviewed Nicole Martin (defendant's girlfriend). Martin stated that she was at the party with defendant. They saw the deceased "jump on" Courrier. Martin and the defendant ran out. While running in the street, she heard gunshots.[22]

---

[20] Spoto DD5, "Interview of [defendant], M/B 17 (Subject of Investigation)."

[21] Spoto DD5, "Interview of Lawrence Lackey."

[22] Spoto DD5, "Interview of Nicole Martin."

<u>Alethia Adams</u>

At approximately 4:30 p.m., at the 79th Precinct, Det. Fisch interviewed Alethia Adams. Adams stated that she arrived at the party at 10:00 p.m. to help. Her brother, Thurland Adams, worked the door. At about 11:30 p.m., a lot of people suddenly ran out. She did not know why and stayed inside. A minute later, she heard two shots, they were not consecutive.[23]

<u>Tikia Jordan</u>

At approximately 4:50 p.m., at the 79th Precinct, Det. Fisch interviewed Tikia Jordan. Jordan stated that she was at the party when "Toto" pulled out a gun and everyone ran, including her cousin, the defendant.[24] She then returned to the party and saw Coutrier being placed in an ambulance. She heard that JD shot the deceased.[25]

<u>Raheem Graham</u>[26]

At approximately 6:30 p.m., at the 79th Precinct, Det. Fisch interviewed Raheem Graham.[27] Graham stated the following:

He arrived at the party at about 11:00 p.m. After midnight, Wayne and "D" (Devine Thomas) were having problems with a guy in a black outfit (Coutrier). Someone turned off the lights to stop the deceased from fighting. Graham went outside with the deceased and Thomas.

Five guys came outside. Graham, Thomas, and the deceased were standing in a row when a black male walked by the deceased. The male was 18 years old, 5'9", "skinny," wearing a red polo goose down jacket with a black stripe on the bottom and a red hoodie.[28] The male put a gun under his armpit and fired once at the deceased, hitting the deceased near the shoulder. The five guys ran off.

The deceased staggered saying, "I'm going to fuck up that boy and catch him," [sic] ran after the shooter. Graham ran into the community center. He then went outside and heard two rapid shots. About five minutes later he heard a third shot. He left the scene.

**Lineup Identification**

From 5:30 to 5:40 p.m., at the 79th Precinct Blackman, Raheem Graham, and Divine Thomas, separately viewed a lineup with defendant as the subject. Defendant was in position number four

---

[23] Fisch DD5, "Interview of Alethia Adams."

[24] Toto's true name is unknown. By all accounts he is deceased.

[25] Fisch DD5, "Interview of Tikia Jordan."

[26] Raheem Graham is Shamik Graham's older brother.

[27] Fisch DD5, "Interview of Raheem Graham." The line-up was conducted from 5:30 to 5:40 p.m. (*see* below), before the 6:30 p.m. interview time indicated on the DD5. Spoto testified that Graham viewed the lineup because he provided a description of the shooter although Graham did not see the shooter's face. (H.28), and that Graham was interviewed before the lineup. (T.139)

[28] Defendant is 5'8" and weighed 150 lbs. (arrest report with pedigree information)

during each viewing. The fillers remained the same.[29] Blackman identified defendant as "the guy who shot [deceased]."[30]

Graham did not identify anyone. He said he did not see the shooter's face.[31]

Thomas identified number four saying, "He shot [the deceased]."[32]

There is no indication in the paperwork that identification procedures were conducted with any other subjects.

**Defendant's Videotaped Statement**

At approximately 9:32 p.m., at the 79th Precinct, defendant made a videotaped *Mirandized* statement to an ADA. Det. Spoto was present. Defendant stated the following:[33]

He went to the party with his uncle, Marty Whitehead, JD, and Coutrier. Defendant met Martin (his girlfriend) there. While sitting with friends at a table in the back of the community center, Lateek came over and told defendant that some guys were beating Coutrier.[34] Lateek pointed to a crowd of guys around Coutrier. Two guys by the door broke up the fight. Everyone started to leave the party. Defendant walked out with JD, defendant's uncle, defendant's girlfriend, and Coutrier, who "was all the way in the back."

Outside, defendant saw the deceased removing his jacket, probably to fight Coutrier. People were separating them when JD walked by and shot the deceased from the side. JD came from behind the deceased, brushed past him, shot him, and ran.

JD's gun was small and silver. JD had his hands in his pocket (defendant demonstrated on video), walked by, fired once, and ran. Defendant initially said that during the shooting, he was at the door of the community center. Later he said that he ran back to the door after the shooting. When asked how close he was to the shooting, defendant described that it was "a ring" and he was at the end of the ring by the door, turning the curve. Defendant and JD were together, and JD walked fast, half-way up the ring to the deceased and shot him.

Defendant heard the deceased say he was hit, and the deceased's cousin yell that the deceased had been shot. Defendant knew the deceased. They went to the same school. Their classes were on the same floor before the deceased was transferred to the GED floor.

Defendant grabbed Martin's hand and ran. Everyone ran after the first shot. They all ran toward Marcy and defendant heard three more gunshots. He ran to Tompkins where he saw his mother in her car.

---

[29] Lineup reports.

[30] Lineup Report for Blackman.

[31] Lineup Report for Graham.

[32] Lineup Report for Thomas.

[33] Videotape R90-828 and accompanying transcript.

[34] CRU could not determine Lateek's identity.

Defendant told her what had happened. She went to the scene and learned that Courtier had been shot in the leg. Defendant returned to the scene and saw Courtier in an ambulance.

Defendant asked around for JD and was told that JD said that defendant should meet him on defendant's block. Defendant went to JD's building where he encountered Junior, who lived in the building. Junior said he just carried JD upstairs, that JD passed out, and that JD gave Junior a gun.

Defendant knew JD for four years. They were friends. Defendant went to JD's apartment and found him hysterical. JD's mother was trying to get him to calm down. Defendant and JD went into the hallway where JD admitted to defendant that he shot the deceased. Defendant told JD the deceased "was alright" and JD did not need "to take it that far."

Defendant then went to Lawrence Lackey's house. Two girls who had been at the party arrived and said the deceased had died. In the morning, defendant left Lackey's and went to see JD, but JD was not home. Defendant went home and found a message for him to call the precinct. Defendant took a shower, called the precinct, and was asked to go there.

A brown-skinned boy with curly hair also pulled out a gun but defendant did not know him. Defendant did not have a gun. Whitehead and Courtier did not have guns.

## THE GRAND JURY PROCEEDINGS[35]

On November 14, 1990, defendant was charged with two counts of Murder in the Second Degree (P.L. § 125.25[1] [direct and transferred intent]), one count of Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03), and one count of Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02[4]).

---

[35] Because grand jury proceedings are secret (C.P.L. § 190.25[4][a]), discussions of the proceedings are redacted. Notably, the presumption of secrecy can only be overcome by demonstrating "a compelling and particularized need" for access to the grand jury material. *Matter of District Attorney Suffolk County*, 58 N.Y.2d 436, 444 (1983). If that threshold is met the court must then balance various factors to determine whether the public interest in the secrecy of the grand jury is outweighed by the public interest in disclosure. *James v. Donovan*, 130 A.D.3d 1032, 1039 (2d Dep't 2015) (refusing to release the grand jury transcripts in the investigation into the death of Eric Garner in Staten Island, citing the strong presumption in favor of grand jury secrecy and the "chilling effect" that a release of transcripts would have on witnesses before such a tribunal).

**THE PRETRIAL SUPPRESSION HEARING**

On February 4, 1992, a *Wade* hearing was conducted.[36]

**The People's Case**

Det. Spoto

Spoto testified as follows:

Blackman, Thomas, and Raheem Graham were at the precinct together and separately viewed the lineup. Spoto did not memorialize or recall the order in which the three witnesses viewed the lineup. (H.5-8, 26)

After viewing the lineup for a couple of seconds, Blackman recognized defendant as the shooter. (H.8-9). After viewing the lineup for 10-15 seconds, Thomas said he was having a hard time. "It looks like number four or five." (H.9, 24) Thomas walked away and seconds before reaching the other side of the room, he returned and said, "Detective, I realize it's Number Four now. I am sure of it." (H.26) Thomas made this determination without viewing the lineup again, and Spoto did not ask Thomas how he came to his decision. (H.27)

Spoto had Graham view the lineup because Graham provided a description of the shooter. (H.28)

**The Defense Case**

Defendant did not present any witnesses or evidence. (H.30-31)

**The Hearing Court's Decision**

The court determined that the lineup procedure was not unduly suggestive. Among other things, Blackman "seemed to know the defendant by his first name," and although Thomas initially expressed doubt, "upon reflection," he was sure the shooter was defendant. (H.34-35)

**THE TRIAL**

Prior to trial, defendant rejected a plea offer to Manslaughter in the First Degree in exchange for a jail sentence of eight and a third to 25 years.[37]

The trial commenced on February 10, 1992.

---

[36] The purpose of a *Wade* hearing (*United States v. Wade*, 388 U.S. 218 [1967]) is to determine whether the identification procedures were so improperly suggestive as to taint an in-court identification at trial. The Court also granted a *Huntley* hearing, but the People withdrew the statement notice thus obviating the need for that hearing (H.2). The purpose of a *Huntley* hearing (*People v. Huntley*, 15 N.Y.2d 72 [1965]) is to determine the voluntariness of a defendant's statement.

[37] Trial Assignment Program handwritten note, 1/23/92.

**The People's Case**

<u>Divine Thomas</u>

Thomas's testimony was consistent with his prior statements. He added the following:

The deceased fought with one of the three boys who first approached and pushed Thomas. Defendant was not among them. (T.165, 195) After the fight at the party, Thomas followed the deceased out to the courtyard. The deceased stopped and turned, and Thomas urged the deceased to leave. The deceased did not respond. (T.166, 202) There were ten or fewer people outside in the courtyard area when Thomas and deceased walked outside. (T.201)

Then about five boys—none of whom had been pushing Thomas earlier—came outside. (T.166, 203) Defendant was in the middle of the group of five boys, who appeared to be hiding him so that no one would know who fired the shot. (T.204)[38] Defendant stood facing Thomas and from approximately seven feet away pointed a gun at him. The deceased was to Thomas' right. He moved in front of Thomas and defendant shot the deceased once. (T.166-69)

The area was illuminated from the lights in the community center and courtyard. (T.174) Defendant was wearing a hooded sweater and a down jacket, which might have been red. (T.207) The hood covered the back of defendant's head to the middle of the top of his head. Thomas saw defendant's face. He had never seen defendant before. (T.174-76)

At first, when he viewed the lineup, Thomas told Det. Spoto that he was not sure whether the shooter was number four or five. Spoto told Thomas to leave the room. Before he reached the door, Thomas was certain the shooter was #4—defendant, because he recalled the shooter had "pointy" ears, hair was cut low down," like a Caesar, "close Jersey" haircut. (T.178-79) Thomas did not know if the other person who was shot (Coutrier) was the one who confronted him inside the party. (T.186) After the shooting and prior to the lineup, Blackman informed Thomas that he had witnessed the shooting as well, and that he knew the shooter. (T.222-25)

<u>Danny Blackman</u>

Blackman's testimony was substantially the same as his prior statements. He added the following:

Blackman and the deceased grew up together. (T.247) Although Blackman had stated in his sworn audiotaped statement that defendant was one of the Nostrand guys who pushed Wayne's head back (*see* above), he now testified that defendant was in the back of community center and was not involved. (T.270) After Duwan Moore broke up the fight involving the deceased, a group of boys ran out and started hopping the courtyard wall, climbing the gates, and running out the exit. (T.248-49) Blackman did not know why they ran out. (T.279) Then the deceased, followed by Thomas, walked out. (T.249)

At this time, Blackman was in "the doorway" behind Thomas, approximately three or four feet from the deceased. (T.303) The deceased yelled out "why y'all running, I just want to ask one of y'all a

---

[38] Thomas identified defendant in court. (T.175)

question." (T.249) Three of the boys stopped, turned around, and pulled out guns. (T.249-50, 307) One of them was defendant. (T.250)

Blackman recognized defendant, but only knew his first name. They had attended the same junior high school. Blackman had also seen defendant in his neighborhood but did not recall how often. He would say, "What's up?" to defendant and keep walking. (T.249, 252)[39]

The prosecutor asked what defendant was wearing, and Blackman replied, "A red hoody—I don't remember the hoody." The prosecutor then asked, "A red hood, did you say 'hoody'"? To which Blackman replied, "Yes." The hood loosely covered the back of defendant's head. (T.252)

Defendant pulled the gun from his waist area and pointed it at both Thomas and the deceased. (T.253) Defendant was directly in front of Thomas and the deceased. (T.306) The deceased stepped in front of Thomas, and said, "Why y'all pulling out guns, we came here to party and y'all want to start over nothing?" (T.254)

The other two boys had hoods covering their faces and were standing to defendant's left. (T.303-04) They had their guns pointing in the air, and just "stood there." (T.304, 308) No one did anything. (T.308) A boy "on a stoop" by the trees asked defendant, "What you want to do?" Defendant, still pointing his gun at both Thomas and the deceased, fired one shot striking the deceased. (T.253-55, 306). Blackman saw defendant fire the shot. (T.254)[40]

During his testimony, Blackman demonstrated that defendant had his arm extended at a slight angle when he fired. Nothing blocked Blackman's view of defendant, and defendant's face, throughout the incident. (T.258-60) The courtyard had light poles and it was bright enough for Blackman to see everything. (T.258)

Blackman did not discuss the incident with Thomas and did not tell Thomas he knew defendant was the shooter. (T.309-10)

### The Defense Case

<u>Jessica Brown</u>

Jessica Brown testified as follows:

Her party at the community center in her building started about 9:30 or 10:00 p.m. (T.331) She knew the deceased her entire life and they were good friends. She was outside, leaning on the door to the center, talking with her boyfriend, when the door pushed open, and she fell. (T.333) A lot of people ran out. Either while she was on the ground or getting up, she heard a gunshot. (T.334, 340) She saw someone she did not recognize in a brown leather jacket pointing a gun at the deceased. (T.334-35) She did not see the shooting. (T.334-35, 341) She next saw the deceased holding his chest. (T.335)

---

[39] Blackman identified defendant in court. (T.253)

[40] Blackman testified in a prior proceeding that he did not see defendant pulled the trigger; he saw the flash of the gun, and he heard the shot.

She knew Blackman and Thomas her entire life and did not see them outside during the shooting. She did not see the defendant shoot anyone. (T.337)

### The Charge and the Verdict

On February 18, 1992, defendant was convicted of Murder in the Second Degree (P.L. § 125.25[1] [intentional]), and Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03). (T.453-54).[41]

Sometime after the verdict, defendant wrote the deceased's parents saying he was sorry about what happened to their son but denying that he was involved in the shooting.[42]

### The Motion to Set Aside the Verdict

On or about April 24, 1992, defendant, through counsel, moved to set aside the verdict pursuant to C.P.L. § 330.30(3), based on newly-discovered evidence—that JD was the shooter and tried to hand a gun to Jadon Jones moments after the shooting.

Counsel's affirmation, in support, stated that on March 31, 1992, the original scheduled sentencing date, Jadon Jones came to court and informed him that after the shooting JD admitted to Jones that he had just shot someone and attempted to give Jones a gun.

An affidavit from Jones, in support, dated April 23, 1992, and notarized by counsel stated the following:

At 1:00 a.m., after the shooting, Jones was near Throop and Gates Avenues, when JD, whom he knew from the neighborhood, ran up to him and said, "I just hit this kid, take this around the corner." JD attempted to hand Jones a gun, but Jones was startled, and the gun fell to the ground. JD picked up the gun and ran off. Jones did not tell defendant or the authorities about this because he feared he would be blamed for the crime and expected that defendant would be acquitted.

### The Court's Decision on the Motion to Set Aside the Verdict

The court summarily denied the motion, without discussion. (S.2)

---

[41] The jury was charged with two counts of Murder in the Second Degree: intentional and transferred intent. (T.427, 431) The court instructed that if the jury found defendant guilty of one murder count it did not have to reach the other murder count. (T.431-32) The jury nevertheless convicted defendant of the alternative murder count of transferred intent, which the court did not accept and set aside. (T.458-59) The jury was also charged with, and found defendant guilty of Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02[4]) The third-degree weapon possession conviction was set aside, apparently because it was a lesser included charge of the second-degree weapon possession conviction. (S.9)

[42] Calendar call, 3/31/92.

13

**The Pre-Sentence Interview and Sentence**

During his pre-sentence interview, defendant maintained his innocence and stated, among other things, the following:

He heard gunshots and saw the deceased grab his chest. The shooter, JD and two others chased after him. He fled with "Trevell" (apparently Travere White [*see* below, CRU Investigation]). He ran home and went to sleep. When the police came to his house, his mother told them that defendant was not home.[43]

On May 22, 1992, defendant was sentenced to concurrent terms of imprisonment of 22 years to life on the murder count and three to nine years on the second-degree weapon possession count. (S.9)

## THE POST-CONVICTION PROCEEDINGS

### The Direct Appeal

Defendant, through counsel, appealed to the Appellate Division, Second Department ("Appellate Division"). He claimed that, among other things, the trial court improperly denied his motion to set aside the verdict based on the newly discovered evidence, and his sentence was unduly harsh and excessive, because considering defendant's youth and negligible criminal background the minimum sentence of 15 years was more appropriate.[44]

The Appellate Division affirmed defendant's conviction stating, among other things, that the evidence was legally sufficient to establish defendant's guilt beyond a reasonable doubt, "[t]he trial court properly denied defendant's motion to set aside the verdict based on newly discovered evidence," and the sentence imposed was not excessive. *People v. McDowell*, 216 A.D.2d 419, 421 (2d Dep't 1995). Defendant's application for leave to appeal to the Court of Appeals was denied. *People v. McDowell*, 86 N.Y.2d 798 (1995) (Simons, J.).

### The Motion to Set Aside the Sentence

By papers dated July 10, 2007, defendant moved, *pro se*, to set aside his sentence, pursuant to C.P.L. § 440.20. Defendant maintained that exceptional circumstances of his case warrant reduction of sentence to a prison term of 15 years to life. Defendant noted that he served 17 years in prison—"the exact number of years" that "he had spent alive at the time of his arrest." He maintained that he had made extraordinary progress at rehabilitation, including that he attended college, obtained professional training, and excelled in institutional and community-based programs. Defendant submitted affidavits in support, including from the Department of Corrections, College Professors, and Clergy and Community groups.

On October 17, 2007, the Supreme Court denied the motion, holding that the sentence was within the statutory guidelines.

---

[43] Pre-Sentence Report. "Trevell" is likely a typographical error for Trevare White.

[44] Appellate counsel investigated defendant's claim that JD shot the deceased for a possible motion to vacate judgment. (*see* below CRU Analysis)

Defendant sought leave to appeal to the Appellate Division from the denial of his motion to set aside his sentence. On July 2, 2008, a judge of the Appellate Division denied defendant's leave application (Fisher, J.).

**The Motion to Vacate the Judgment of Conviction**

By papers dated October 3, 2007, defendant moved, *pro se*, to vacate the judgment of conviction, pursuant to C.P.L. § 440.10(1)(g) and (h), on the grounds of newly discovered evidence and ineffective assistance of counsel, respectively.

Regarding the ineffective assistance of counsel claim, defendant argued that counsel, among other things, failed to interview potential defense witnesses, whose affidavits defendant submitted with this motion. Regarding the new evidence claim—defendant stated he was not involved in the shooting, and since trial, had learned that JD confessed to others. Defendant submitted Jadon Jones's 1992 affidavit stating that JD confessed to him (*see above*, Motion to Set Aside Verdict), as well as other affidavits from several other individuals, dated between July and September 2007.

Defendant also submitted a 1991 letter from JD intimating that he shot the deceased, and defendant was not involved. Defendant stated that he gave the letter to counsel. Counsel read the letter, said, "this is good, but we need something more specific," and he (counsel) would hold onto to the letter.

<u>JD's Letter</u>
(Copies of JD's letter and mailing envelope are attached as CRU Exhibit 1)

JD's handwritten letter to defendant was dated January 30, 1991. Defendant submitted the accompanying envelope which had a return address in Jacksonville Florida. The letter included the following:

> Emel, you know me & you were friends for a very long time. And that incident that occurred should not break our friendship. I want you to know that if it were the other way around, I would hold out & try to make the best of things. Emel, don't think for one bit that cause I'm out here I'm not suffering. (Cause I am). . .

> Man I'm suffering. I have nightmares, I can't sleep or eat. Sometimes I just pray for death. I don't think I deserve to walk the face of the earth because one of my best friends is locked up, for something that he didn't do. I feel like this if whoever didn't do what they had to do, all three of us (me, you, Troy [Coutrier]) probably would have been dead. . . I am not out here hiding. I'm in Florida, so I can try to get peace in my mind & soul. Cause on the block certain people kept pressuring me to do things that would not help <u>me</u> or <u>you</u>.

(emphasis in the original)

JD asked defendant to keep the letter confidential.

Trevare White's Affidavit

In his affidavit, Trevare White stated, in pertinent part, the following:

He went to the party with "Moody" (Mahmoud Jones). A group of 20 attacked Coutrier. After, as he and Mahmoud went to help carry Coutrier out, everyone ran to the exit, where a male armed with a knife allowed only the deceased's friends to leave.

The deceased, Toto, and four to five others blocked White, Mahmoud, and JD from leaving.[45] The deceased "already had his gun out" and a confrontation ensued between the deceased and JD. JD fired once striking the deceased in the chest. White, Coutrier, and Mahmoud ran out of the community center. Toto shot at them, hitting Coutrier in the leg. Defendant was not at the scene of the shooting.

White stated he provided this information to trial counsel, who refused to call White as a witness because he had a pending case.

Raheem Brooks' Affidavit

In his affidavit Brooks stated, in pertinent part, that a few hours after defendant's arrest, JD came to Brooks' house and said that he went outside to approach the deceased, and the deceased was with two to three others, one of whom had a gun. JD said he shot the deceased "before anything else could go down."

Shameka Jones' Affidavit[46]

In her affidavit, Jones stated, in pertinent part, that she observed the deceased and others punch and stomp Coutrier at the party. JD attempted to break up the fight, After the fight, security made everyone leave in small groups. JD and others sat Coutrier down in a chair inside.

JD then went outside with Jones. As Jones turned the corner to go up the ramp, she passed the defendant, Nicole Martin and a male looking around. Half-way up the ramp, JD stopped to put on his hood. When he reached the deceased, JD pulled a gun from his pocket, shot the deceased in the chest, and ran.

Jones stated that she did not come forward before because JD lived in her neighborhood, and she did not want problems. She recently learned that JD moved away.

Malkia Walker's Affidavit

In her affidavit Walker stated, in pertinent part, the following:

She was at the party with Shameka Jones and witnessed the assault on Coutrier. After the fight, she went outside and saw defendant for the first time that night. He was with Nicole Martin and a male, watching people come outside as if he was looking for someone.

---

[45] More than one person said Toto shot Coutrier.

[46] Shameka Jones is Jadon Jones' ex-wife.

Walker passed defendant, and about mid-way up the ramp, someone from a group of males fired a shot, after which someone from the group ran through the tunnel and out to the street. People were climbing over the wall, and defendant helped some girls climb over.

Defendant did not shoot the deceased. Walker did not come forward before because she was young at the time, thought defendant would be acquitted, and was afraid of the real shooter.

Mahmoud Jones' Affidavit

In his affidavit, Mahmoud Jones stated, in pertinent part, the following:

He arrived at the party with Trevare White. He witnessed the deceased and others assault Coutrier. He, White, and JD helped Coutrier up. JD told him and White to seat Coutrier in a chair. JD went outside alone.

He and White then went outside. The deceased was at the top of the ramp with friends. He was removing his jacket and said something as if he was getting ready to fight. Jones saw someone near the deceased shoot the deceased on the side of his chest and run out through the tunnel to the sidewalk. Jones and White ran out of the courtyard to the street. Toto came out to the street and fired shots. Defendant came from the courtyard out to street.

Defendant could not have been the shooter because defendant was shorter than the shooter and dressed differently, and because defendant left the courtyard after the shooter fled.

Raheem Simmons (Graham) Letter

An undated handwritten letter addressed to "Skeet," signed by Raheem Simmons (believed to be Graham), stated, in sum and substance, the following:

"Dee" (Devine Thomas) is "talking good" but is scared. The shooting was provoked by Thomas. "[Y]our man" [defendant] wasn't the one who shot Pee [the deceased], it was one of [Thomas'] man's [sic]." Everybody thought it was defendant "because he had his gun out, but I can recall everything." Graham offered to help in any way he could and said he would continue to urge Thomas to write a recantation.

**The Court's Decision on the Motion to Vacate**

In a written decision, dated August 14, 2009, the Supreme Court granted a hearing to determine whether such evidence was considered "newly discovered."

**Defendant's Murder Conviction is Vacated, and He Pleads Guilty to Manslaughter Under an Acting in Concert Theory**

On December 14, 2009, a hearing on the motion to vacate was set to commence. Before the hearing began, the People proposed a plea offer. (P.2)[47] The People stated that upon reviewing the case they noted that defendant had moved to reduce his sentence to a prison term of 15 years to life (*see* above,

---

[47]Defendant intended to testify and present the testimony of Trevare White, Raheem Brooks, Malkia Walker, Shameka Jones, and Arlinda McDowell. (*see* 2/10/09 fax between defense counsel and an ADA; defense file containing witness subpoenas). Defense counsel informed CRU that trial counsel would also testify.

motion to set aside sentence). This prompted the People to agree to vacate the murder conviction, in exchange for defendant's plea of guilty to Manslaughter in the First Degree, in full satisfaction of the indictment. The People explained that in 1990, the sentence for first-degree manslaughter was 6-18 years' incarceration. If defendant was resentenced to first-degree manslaughter, it would amount to time served. (P.5, 9)[48]

As a condition of the offer, defendant agreed to "allocute to acting in concert with at least two others in the commission of that manslaughter in the first degree while armed with a handgun." (P.8) Moreover, defendant would waive the right to appeal the manslaughter conviction and resentence, and any further collateral motions. (P.11, 13-15)

The People noted that defense counsel, representing defendant at the hearing, was opposed to the plea. Counsel said that defendant would most likely reject the offer. (P.5-6) The court recessed so that defendant could discuss the offer with about five members of his family, including his mother and brother, who were present. (P.7, 17-18)

Defendant then accepted the offer and its terms. In pertinent part, the following colloquy ensued:

> THE COURT: Now, is it true that on or about October 27th, 1990, in the County of Kings, you, while acting in concert with at least two others, and you armed with a weapon, were involved in a shooting with the victim—caused the death of [the deceased], who died of gunshot wounds on October the 27th, 1990? Is that true?
>
> THE DEFENDANT: Yes.
>
> [ADA]: How many people in total confronted the victim and his friends?
>
> THE DEFENDANT: Three.
>
> THE COURT: Who were those three individuals?
>
> THE DEFENDANT: Myself, [JD] and I can't recall the third person.
>
> . . .
>
> THE COURT: Okay. And you were armed with a handgun?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And [JD] was armed with a handgun?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And the third person was armed with a handgun.
>
> THE DEFENDANT: Yes.
>
> THE COURT: Who was it that fired the shot?
>
> THE DEFENDANT: [JD].

---

[48] The People explained that under the 1990 statute for first-degree manslaughter, the 6 to 18-year sentence was legal for a first-time offender, as defendant. (P.8-9)

(P.18-19)

The People accepted the allocution and the Supreme Court resentenced defendant as promised. Defendant was remanded for a final calculation of his jail time. (P.21) Two days later, December 16, defendant was released.[49]

## THE CRU INVESTIGATION

CRU investigated defendant's claim that he was pressured to plead guilty to manslaughter, because he did not want to spend another day in prison for a crime he did not commit. He maintained that JD was the shooter, and that he (defendant) did not possess a gun, or act in concert with others to shoot the deceased.

CRU reviewed the entirety of the People's and defense files, including the appeals files. CRU interviewed myriad witnesses—the relevant ones are as follows:[50]

### Defendant

CRU first interviewed the defendant by video, and then again at the KCDA. Both times CRU interviewed defendant with his attorney present. The defendant stated the following:

Before the party, he went to his grandmother's house with his uncle, JD, and Coutrier. They then went to the party. Defendant was wearing a powder blue Giants varsity jacket with white leather sleeves and an orange helmet design on the back, with no hood. He was not wearing a hooded top under the jacket. He was at the party during the fight but did not witness it. After the fight everyone rushed out in small groups. Defendant lingered behind because he was "nosy" and wanted to know who was involved in the fight. He later learned the deceased beat up Coutrier and JD was there.

Defendant heard yelling from outside from someone he believed to be the deceased: "Y'all better come out." Defendant, Lackey, White, Mahmoud Jones, and Nicole Martin went outside. They turned the "L" and walked up the ramp. Defendant heard a gunshot from further up the ramp.

On defendant's way out, several people brushed past him. He did not notice that JD was one of them, until JD later told him, "I saw you was waiting by the door, and I walked right past you." Defendant did not say when that conversation took place.

Defendant said he saw JD go toward the deceased at the top of the ramp. However, defendant also stated that he did not see JD outside and he first saw the deceased outside after he was shot.

Defendant also stated that he saw the shooting. Someone in a black Carhartt jacket, wearing a hood, came from behind, passed them on the ramp, walked up to the deceased, put one arm on the deceased's shoulder, and shot him under the armpit from close range. The shooter then fled.

---

[49] *See* Rap Sheet.

[50] Blackman, Coutrier, and Raheem Graham died before CRU's investigation. Shamik Graham, Shameka Jones, Mahmoud Jones, and Alithia Adams refused to speak with CRU. Alithia's brother, Thurland Adams, the doorman, had nothing to add.

Defendant was 10-15 feet behind the shooter. The shooting occurred on the top of the ramp by the tunnel, and not in front of the door, as numerous witnesses reported.

Defendant and Martin ran out of the community center and passed the deceased holding onto a fence on the ramp. At the time, defendant was not certain JD was the shooter because he was behind the shooter, and the shooter wore a hood and a popular jacket. Defendant later learned it was JD, upon hearing it from others who observed JD shoot the deceased.

As defendant ran to the street, he heard three to four gunshots and on his way home heard that Coutrier had been shot.

Defendant first went to Lackey's house and ended up falling asleep there. When he went home, his mother told him the police had been there looking for him, defendant went to the precinct. He was not concerned because he was not involved in the shooting. At the precinct, he learned that the deceased had died.

Defendant did not have a gun or see any guns at the party. He did not know JD had a gun that night and did not see JD shoot anyone. Defendant explained that when he told the police he saw JD shoot the deceased, it was based on what he heard from his friends.

Shortly after the shooting, there were rumors that the shooter was a friend of "Emel's." Defendant believed that Blackman probably told that to the deceased's family but was pressured to identify someone. Thus, Blackman identified defendant.

JD and Coutrier did not know the deceased. Defendant knew the deceased from high school. They had a cordial relationship without problems. Defendant could have possibly diffused the conflict at the party if his friends came to him instead of resorting to violence.

Defendant did not speak with JD after the party. They spoke several times after defendant's arrest. Defendant's mother spoke to JD as well. JD confirmed defendant was not involved in the shooting but would not admit to anything.

Defendant replied to JD's 1991 letter but never heard back. Defendant asked Raheem Brooks to encourage JD to respond. JD never did. Defendant sent an investigator to speak with JD prior to defendant's 440 hearing, but JD made it clear "that wasn't going to happen." A reporter for the New Yorker also attempted to speak with JD around the same time but was unsuccessful.[51]

After defendant's arrest, defendant and JD spoke on the phone. JD said he had been scared and felt threatened when he shot the deceased. JD said "we" could have been killed, meaning JD and Coutrier. Defendant did not feel threatened by the deceased or the deceased's friends.

---

[51] A New York Magazine reporter told CRU, that more than 10 years ago he was interested in defendant's case, and befriended JD on Facebook, but he never spoke with JD or mentioned JD's letter to him.

**Trevare White**

CRU interviewed White at the KCDA. White's statement was essentially the same as his affidavit. He added the following:

The deceased's friends were the only ones allowed to leave the community center after the fight with Coutrier. JD and the deceased, both of whom White knew from the neighborhood, were still inside near the door. It appeared that the deceased was confronting JD and preventing JD from exiting. JD said something to the effect of, "I thought that was over, I thought that was a dead issue."

Next, White heard a gunshot and saw a flame near JD. White assumed that JD shot the deceased. JD was about eight to 10 feet from the deceased at the time, and the deceased was a few feet from the door. White was further back inside the room, facing the deceased, and JD was in front of White. The deceased fell, and his friend, Toto, was holding him. White did not see the defendant in the vicinity of the shooting. After JD shot the deceased, White, Mahmoud, and Coutrier went out to the street. Toto approached them and displayed a gun. White and Mahmoud ran, and Toto shot Coutrier in the leg.

CRU read White his affidavit from 1997. After hearing the statement, White stated that he was sure the deceased had a gun "because he was pressing" JD. White then said he saw a silver gun. White did not see defendant with a gun. He did not see defendant after JD shot the deceased.

After defendant was arrested, White told trial counsel about the information he had, but trial counsel did not want to use White as a witness because White had a pending case.[52]

**Duwan Moore**

CRU interviewed Moore (who now went by the name Duwan Hyman) by phone. Moore acknowledged that he spoke to the police after the shooting but denied telling them he was driving by at the time of the shooting (*see* above, Police Investigation, Moore interview). Moore now stated the following:

He observed the shooter standing on a two-foot-high flowerbox, close to the deceased. The shooter's friends were near him. The shooter leaned down toward the deceased, placed the gun on his shoulder/chest area and shot him. Nothing was said prior to the shooting.

During this time, Moore was by the door to the community center, five to six feet from the shooter. Everyone was outside, including Blackman, Raheem Graham, and Shamik Graham.

After shooting the deceased, the shooter jumped off the flowerbox and fled through the tunnel. The deceased chased the shooter and collapsed in the tunnel. Moore rode in the ambulance with the deceased to the hospital.

Moore did not see anyone else with a gun, He heard gunshots coming from the direction of Throop when he was in the tunnel. Moore did not know the shooter, did not recall what the shooter looked

---

[52] White did not recall whether his pending case was a Brooklyn case, in which he was later sentenced as a youthful offender, or a Manhattan case for which he was later sentenced to probation.

like, or how the shooter was dressed. Moore would not be able to recognize the shooter if he saw him today.

The shooter was not the person with whom the deceased fought at the party (Coutrier) but was Coutrier's friend. Moore did not attend or follow defendant's trial but did not doubt that defendant was the shooter. He believed Thomas would have had the most accurate information.

**Lawrence Lackey**

CRU interviewed Lackey at his residence. Lackey stated the following:

He went to Jessica's party with defendant and two boys he did not know. One of those boys (Coutrier) fought with the deceased at the party. Lackey and defendant went outside to the courtyard. It was crowded.

The deceased and Coutrier were in the courtyard and about to fight again. They were more than 15 feet from Lackey, who was near the door. Defendant was a few feet in front of Lackey.

Someone ran across the courtyard toward the deceased, and then Lackey heard a gunshot. Lackey did not see the shooter. He could not describe the features or clothing of the person who ran past him, but he did not recognize that person.

Lackey and defendant were both wearing football jackets. Defendant had on a Giant or Jets jacket, which was either white and blue, or white and green. Lackey did not see anyone with a gun.

After the shot was fired, everyone in the courtyard dispersed. Lackey and the defendant left together. They were told that word on the street was that defendant was involved in the shooting. Defendant and Lackey went to Lackey's house, and they went to defendant's house the following morning. Defendant's mother said the police had been there and he should go to the precinct. Lackey went with defendant to the precinct. They were interviewed in separate rooms.

After defendant's arrest, Lackey did not communicate with defendant. Trial counsel did not contact him, and he did not come forward on his own. Defendant reached out to Lackey last year to say that someone would contact him. The shooting was not discussed.

**The ADA at the Plea**

CRU interviewed the ADA by phone. He did not recall whether the People planned to present any witnesses at the 440 hearing, or if he discovered a problem with the case resulting in the plea offer. However, he was certain he would not have offered defendant a plea to any crime if he thought defendant was innocent. Upon his review of certain documents, the ADA believed that he weighed the likelihood of defendant prevailing at the hearing against the 19 years defendant had already served in prison and made the offer in the interest of justice.

**Malkia Walker**

CRU interviewed Malkia Walker at KCDA. Her statement differed from her affidavit as follows:

She added that the police never questioned her, and she did not want to be involved because she was in and out of jail at the time.

While she stated in her affidavit that she saw defendant for the first time when she left the party after the fight, she now stated she exited the community center and went up the ramp, with defendant and Martin directly behind her, and defendant asked about Courtier's whereabouts.

She also stated in her affidavit that the shooter was in a crowd, that she heard a shot being fired from the crowd when she was mid-way up the ramp and defendant was somewhere behind her, and that she saw defendant help people over a wall after the shooting. Now she stated that she, her friend Shameka, defendant, and Martin went all the way up the ramp and left the courtyard and did not hear shots until all four of them were on the sidewalk. After hearing the shots, they started running down Gates Avenue toward Throop Avenue. She added that she saw Courtier lying on the ground on the corner of Gates and Throop Avenues. She believed that JD, who was wearing a black hoodie, came to help Courtier.

Walker did not see who fired the shots at the party and did not see or know anyone carrying a gun that night. When CRU confronted Walker with her affidavit, it did not refresh her recollection. But Walker said it must have been more accurate than her recent memory.

### Jadon Jones

CRU interviewed Jones at KCDA. Jones' statement differed from his affidavit, which defendant submitted in support of the motion to set aside the verdict (*see* above). Jones stated the following:

He knew defendant since childhood; they were very good friends and attended the same high school. He went to the party with defendant, Courtier, JD, Lackey, and others. Defendant and Martin left the party about 10-20 minutes before the fight broke out between Courtier and one of the deceased's friends. Everyone ran out.

Jones was a few feet from the gate when he heard one or two gunshots, which sounded like they came from the courtyard. Jones did not see the shooting, or any guns. Defendant had left long before this happened.

Jones ran to Gates and Throop Avenues, where he waited for Courtier and JD. JD ran up to him yelling that he thought Troy was dead. JD fainted. Jones carried JD to JD's apartment building where JD regained consciousness, and Jones brought him home.

Jones was reluctent to say anything further. After pausing, he added that JD said he shot someone because they jumped Courtier. CRU confronted Jones with his affidavit about JD (*see* above), Jones said his affidavit was true. Jones was not forthcoming with CRU because he did not want to help prosecute JD. Jones then acknowledged that JD attempted to give him a gun after the shooting. Jones maintained that defendant did not commit the crime. Witnesses at defendant's trial were mistaken that defendant had on a black jacket the night of the party. Defendant was wearing a varsity Giants jacket with white sleeves. Jones believed he had given trial counsel the information contained in his affidavit before the jury verdict, and counsel did not call Jones as a witness because Jones could not be guaranteed "amnesty."

**Nicole Martin**

CRU interviewed Martin at her residence. Her statement was essentially the same as her statement to the police (*see* above, Police Investigation). Martin stated the following:

She was defendant's girlfriend from the time of the shooting until just before he was released from prison in 2009. Consistent with her statement to the police, she and defendant went outside for a few minutes. She did not recall telling the police that when they went back into the party, they saw the deceased "jump on" Coutrier, but she did not doubt it because everything she told the police was true.

Although she told the police that after the fight with Coutrier, she heard gunshots while she and defendant were outside running toward Monroe Street, Martin told CRU that she heard approximately three gunshots coming from inside the party, and then she and defendant ran out. She added that defendant was wearing a hoodie and dark clothing, and defendant did not have a gun on him that night. She knew the deceased from the neighborhood and was friendly with him. Martin did not recall seeing defendant's friend JD at the party. Word on the street was that JD was the shooter. No one contacted her to testify at defendant's trial, or the 440 hearing, and her mother did not want her to get involved. She was never pressured to lie for defendant. At the time she spoke to the police, she did not know defendant was a suspect.[53]

**Divine Thomas**

CRU interviewed Thomas near his residence. Thomas did not recall everything, but he was mostly consistent with his prior statements and testimony. He added the following:

He believed that the boys who confronted him at the party confused him with someone else called "D." The shooter was brown-skinned and had a slim build. He had never seen the shooter before. He did not recall how the shooter was dressed. He did not recall anyone wearing a sports team jacket.

The shooting occurred in the courtyard directly outside of the community center door, between the door and a tree encircled by a low retaining wall.[54] Thomas did not believe the shooter was standing on anything. At the lineup Thomas was sure the defendant, in position number four, was the shooter because Thomas remembered his face. He denied that he had hesitated in identifying defendant. No one pressured him to identify defendant. He did not recall speaking to Blackman around the time of the lineup. Thomas was certain defendant was the shooter. CRU showed Thomas the defendant's arrest photograph, and Thomas confirmed that defendant was the shooter. He recalled the defendant's pointy ears.

---

[53] Martin showed CRU two affidavits she prepared at the defendant's behest that had not been previously provided to the court or to CRU. One was notarized in 1997 and the other in 2007. Both were essentially consistent with her statement to CRU.

[54] CRU showed Thomas the crime scene pictures. He identified the location of the shooting in one of photos, which shows the retaining wall and a portion of the tree.

**Raheem Brooks**

CRU interviewed Brooks at KCDA. His statement was essentially consistent with his affidavit submitted in support of defendant's motion to vacate judgment (*see* above), with additional information. Brooks stated the following:

He and Coutrier were cousins.[55] Brooks was very close friends with both defendant and JD. Brooks did not attend Jessica's party because he was too young. The day after the party (his affidavit said hours after defendant's arrest), JD came to Brooks' house and said that Coutrier had been jumped at the party, and the assailants shot Coutrier. JD felt his life was in danger, so he shot someone, who was either the person who shot Coutrier or one of the shooter's friends.

JD told him he shot the deceased either inside the party or in a hallway at very close range. Brooks demonstrated what JD had described, holding his right hand under his left elbow, and shooting the deceased from the side. After the shooting JD moved down South. JD was very distraught after the shooting and would have turned himself in, but his mother stopped him. Brooks thought JD would want to confess today if he knew he would not go to jail. Although defendant knew that JD confessed to Brooks, defendant did not ask Brooks to "snitch" by testifying.

Brooks believed that JD shot the deceased in defense of Coutrier and JD's friends. Brooks stayed in contact with both defendant and JD. In 2007, JD asked Brooks to tell defendant that JD moved to Staten Island. Defendant took this as a threat, because defendant's mother lived on Staten Island. After JD's veiled threat, Brooks decided to write his affidavit for defendant. Brooks did not know whether defendant had a gun the night of the party; they never discussed it.

**JD**

<u>The Investigation</u>

CRU learned that the defense appellant attorney investigated the possibility of filing a C.P.L. § 440.10 motion, on defendant's behalf, based on a claim that JD was the actual shooter. On November 22, 1996, a defense investigator made a surprise visit to JD. When confronted with the 1991 letter to defendant, JD admitted that he wrote it, but did not admit to the shooting. The defense decided not to file the motion.[56]

<u>Jeffrey Butler</u>

CRU interviewed Jeffrey Butler at his residence. Butler stated the following:

JD and Jeffrey Butler's ex-wife, Kimberly Butler, are first cousins. Sometime around January 1991, JD lived with them in Jacksonville Florida, at the same address as the return address on the envelope that contained JD's letter to defendant (*see* CRU Exhibit 1). Butler reviewed JD's letter and did not recognize the handwriting. It was not reflective of how JD spoke then or now. Butler and JD kept in contact through social media, and they usually spoke by phone around Christmas.

---

[55] Brooks told CRU that Coutrier died approximately 8 years ago.

[56] Defense appeals file at 257-59, 261.

<u>Kimberly Butler</u>

CRU interviewed Kimberly Butler at her place of employment. Butler and JD are first cousins. JD lived with her and her ex-husband, Jeffrey, in Jacksonville in the early 1990s. She reviewed the 1991 letter to defendant. She did not recognize the handwriting but had no reason to doubt JD wrote it. She did not know anything about the shooting.

<u>JD's Confession to CRU</u>

After speaking to the Butlers, CRU interviewed JD at KCDA in the presence of his attorney. JD stated the following:

He went to the party with defendant, defendant's uncle, Marty (Whitehead), and Coutrier. Defendant was having problems with certain people with whom he went to school. Whitehead told JD that defendant was "acting up" and pointing a gun at people's heads. Coutrier had been with defendant when he was putting guns to people's heads inside the party. Whitehead asked JD to "keep an eye on" defendant. JD saw defendant put a gun to the head of a boy named "D" or "Dirty D" (presumably Thomas). JD took the gun away from defendant. Defendant was drunk.

Twenty minutes later, Thomas left the party and returned with the deceased and others, who were carrying guns. JD knew the deceased. He was a bully. The deceased beat up Coutrier at the party. Defendant was not present at the time. After the fight, the deceased and about five or six of his friends pulled out guns. The deceased asked JD if he was "with them?" Thomas said that JD did not point a gun at him—that person was the one the deceased beat up (Coutrier). Thomas went to school with [defendant].[57]

The DJ, or bouncer, told the deceased and his friends to leave. Before they left, the deceased said he was going to kill JD, Coutrier, and defendant. Defendant was not present at the time. Coutrier and then JD left. As JD was leaving, defendant emerged from behind the door where he had been hiding. Defendant said, "they're going to kill us." The bouncer pushed JD and defendant outside.

The deceased, holding a gun, ran at them. Defendant was behind JD. JD and defendant had their backs to the door. Defendant whispered to JD to pass him the gun, which JD had in his pocket. JD was unable to pass the gun in time, so he shot the deceased in self-defense using defendant's gun. Defendant was not armed. JD was facing the deceased when he shot him. The shooting took place outside, to the left of the exit door. Thomas was very close by.

JD jumped over a gate and ran toward Throop Avenue. Defendant ran toward the deceased. A friend of the deceased was pointing a gun at defendant. Defendant pushed Coutrier in front of him, and Coutrier was shot. Defendant was the only one in JD's group who had a gun. It was a .22 or .25 caliber revolver. Defendant always had it with him. Prior to the shooting, JD had been arrested for a gunpoint robbery.

---

[57] The deceased, not Thomas, went to school with defendant.

The defendant was wearing a "Triple Fat" down jacket that night. JD was wearing a sweatshirt type jacket. He was not wearing a hoodie during the shooting. Defendant had his hoodie up during the shooting.

JD felt that defendant had been the agitator that night and placed JD in the "predicament" where he had no choice but to shoot the deceased.

JD never spoke to his friend Raheem Brooks about the shooting. JD corroborated Jadon Jones' account that he saw JD after the shooting and JD had a gun. However, JD said Jones wanted to take the gun from JD and JD refused to give it to him, because JD wanted to return it to defendant. The next day, JD returned the gun to defendant. Defendant was celebrating and said, "We caught a body!" (Notably, defendant was in jail the next day having been arrested.)

Defendant's trial attorney never contacted JD.

**CRU ANALYSIS**

CRU has determined that defendant's manslaughter conviction should be vacated for several reasons. First, there is no question that JD, and not the defendant, shot and killed the deceased. Furthermore, although defendant's manslaughter conviction was based on an acting in concert theory with JD as the shooter, such a theory is not supported by JD's credible confession to CRU, and the accounts of some of the witnesses CRU interviewed.

Second, although defendant's murder conviction was vacated, defendant probably would not have been charged with fatally shooting the deceased had there been a more thorough police investigation.

Third, had trial counsel investigated the information he possessed at the time of trial indicating that JD was the shooter, or, at least, provided the information to the prosecution, it is likely that the murder charge would have been dismissed. It is axiomatic that, without the murder conviction, defendant would have never been in position to plead guilty to manslaughter.

Last, it is apparent that under the unique facts presented here, which CRU learned during its investigation, defendant—who filed every possible motion to prove his innocence and/or modify his sentence to 15 years—accepted the People's offer for freedom and in doing so was compelled to falsely admit to accomplice liability.

**JD Confirmed to CRU that He Shot and Killed the Deceased, and Credibly Maintained that He Acted Alone.**

There is no doubt that JD, and not defendant, shot and killed the deceased. The People conceded this fact in 2009, when they agreed to vacate defendant's murder conviction and accepted defendant's manslaughter plea allocution that JD was the shooter.

Since then, CRU confirmed this fact when JD credibly confessed to CRU that he shot and killed the deceased. Notably, in 1996, JD had admitted to an investigator for defendant's appellate counsel that he wrote the 1991 letter to defendant—an apparent admission of guilt—but JD would not admit to anything else. Years later, after independently confirming that JD's letter was likely written when JD was living with his cousin in Jacksonville, when CRU confronted JD with his letter to defendant, JD's

demeanor and emotional state throughout the interview demonstrated that he was overwhelmed with guilt and relieved to confess.

JD not only confessed to the shooting, but he also made it clear that he acted alone, and that defendant was not armed. Significantly, there has been no relationship between JD and defendant since defendant's arrest to suggest that JD was lying for a friend. Indeed, JD attempted to shift the blame to defendant by claiming that defendant pointed a gun at friends of the deceased at the party earlier in the evening, precipitating a confrontation that left JD with no choice but to shoot the deceased in self-defense.[58]

To establish accessorial liability, the People must prove beyond a reasonable doubt that the accused acted with the mental culpability necessary to commit the crimes charged and that, in furtherance thereof, he solicited, requested, commanded, importuned, or intentionally aided his alleged accomplices to commit such crimes.[59] The defendant's "mere presence at the scene of a crime, even with knowledge that the crime is taking place, or mere association with a perpetrator of a crime, is not enough for accessorial liability."[60]

Here, JD maintained that defendant was not present when the deceased assaulted Coutrier. Significantly, this was confirmed by Devine Thomas who told the police he saw defendant for the first time outside in the courtyard. Moreover, not one witness, including Blackman and Thomas, claimed that defendant fought with the deceased at the party.

JD also maintained that defendant was not present when deceased threatened to kill them, and defendant did not have a gun when JD shot the deceased. Thus, it does not appear that defendant had any motive to kill the deceased.

To the extent that defendant asked JD to pass him the gun, this alone does not demonstrate accomplice liability. Defendant did not tell or suggest to JD to shoot the deceased. Indeed, defendant could have been asking for the gun to diffuse the situation and prevent a shooting, as defendant told CRU he believed he could have done.

Notably, the People's theory at trial was that defendant acted alone. To be sure, Thomas testified that defendant was standing among a group of five boys, who appeared to be hiding him so no one would know who fired the shot. (T.204) Notwithstanding that it is now known that Thomas was mistaken in his identification, even assuming that defendant was part of the group, that is insufficient to establish that he acted with the shooter rather than merely being present.

---

[58] JD, incredibly, told CRU that he had seen the defendant pointing a gun at several partygoers' heads and had disarmed defendant to prevent him from shooting one of his targets. It is evident that JD was attempting to exculpate himself. Despite the various and inconsistent accounts of all the witnesses interviewed both by the police and CRU, not one version supports JD's story about what led to the shooting.

[59] See P.L. § 20.00.

[60] See, e.g., People v. Chardon, 83 A.D.3d 954, 956-57 (2d Dep't 2011) (People failed to demonstrate, either directly or by inference through the actions of the defendant based on the entire series of events, that the defendant carried a dangerous instrument, stabbed the complainant, or was aware that any of his co-perpetrators intended to do so); see also People v. Lopez, 137 A.D.3d 1166, 1167-68 (2d Dep't 2016).

Although Blackman described that the shooter and two other individuals displayed firearms at the time of the shooting, Blackman said the other two individuals were just "standing there" with their guns in the air (T.255, 304), and did nothing. (T.308) He did not describe their distance from the deceased or suggest that they took any steps, or said anything, to encourage the shooter.

Thus, even assuming that Blackman and Thomas were correct about everything <u>except</u> the identity of the shooter, no view of the evidence imputes any culpability to the defendant. If defendant was part of the crowd that surrounded that shooter, Thomas never claimed or testified that anyone in the crowd was armed or encouraged the shooter. If defendant was one of the shooter's two friends who, according to Blackman's trial testimony, "stood there" with guns pointed in the air (T.255, 304), Blackman did not testify that the shooter's friends pointed their guns at anyone or took any affirmative action to aid the shooter.

**The Inadequate Police Investigation**

Defendant was arrested less than 24 hours after the fatal shooting, after myriad witnesses were interviewed. The initial witnesses—Troy Coutrier, Duwan Moore, and JD—provided no information about the shooting. Shamik Graham did not see the shooting but saw someone he did not know wave a gun around about five minutes before the deceased was shot.

There were three witnesses who saw the fatal shooting: Devine Thomas, who did not provide a description of the shooter and had never seen him before; Raheem Graham, who did not know the shooter; and Danny Blackman who named defendant (by his first name) as the shooter.

Clearly based on Blackman's statement, when defendant voluntarily arrived at the precinct, Det. Spoto treated him as a suspect and *Mirandized* him. After defendant waived his rights, defendant stated that he heard a gunshot and ran out of the courtyard with his girlfriend Nicole Martin. He later learned Coutrier and the deceased had been shot.

Notably, the interviews conducted immediately after defendant's initial interview corroborated defendant's statement that he was not the shooter.  Lawrence Lackey said he did not see the shooting and was with defendant and defendant's girlfriend at the time. Nicole Martin said she ran out of the courtyard with defendant, heard gunshots, and they later learned that someone had been shot. Tikia Jordan, a cousin of the deceased, said she heard <u>JD</u> shot the deceased.

When defendant was then placed in a lineup, Graham did not identify defendant. And as Det. Spoto testified at the hearing, Thomas had a hard time and could not decide. On his way out, without viewing the lineup again, Thomas decided it was defendant without explanation. (H.9-10, 27-26)[61]

Following the lineup, defendant made a videotaped statement claiming that JD shot the deceased.

Against this backdrop—where defendant consistently maintained his innocence, several witnesses corroborated defendant was not the shooter, JD was mentioned by the deceased's cousin as having

---

[61] At trial, Thomas testified that he identified defendant by his pointy ears and low haircut. (T.178-79)

29

been the shooter, and defendant provided a detailed account that JD was the shooter—it is most troubling that the police simply ended their investigation with defendant's arrest.

This was likely due to tunnel vision and confirmation bias, which explains the tendency to focus in prematurely on a plausible theory of the case and then embrace information that supports that theory and reject information that contradicts it. Under these precepts, one acts with "unwitting selectivity in the acquisition and use of evidence. . . [T]hat people can and do engage in case-building unwittingly, without intending to treat evidence in a biased way or even being aware of doing so, is fundamental to the concept."[62] In the context of criminal justice, tunnel vision leads the police to focus on one suspect and discount evidence to the contrary. Similarly, confirmation bias leads investigators (and prosecutors) to filter in evidence supporting their theory and to ignore or undervalue evidence that suggests their theory might be incorrect.[63]

Here, police accepted prematurely the theory that defendant was the shooter, and confirmation bias prevented the police from questioning or evaluating Thomas' hesitant identification of defendant, as well as questioning Blackman's identification of defendant.[64] It also prevented the police from giving any credence to defendant's claim that JD was the shooter. They refused to consider JD a suspect. The police could have easily reinterviewed JD. Moreover, given that JD had been arrested before, a photographic array could have been prepared and shown to the witnesses who observed the shooting. While it is not certain that the witnesses would have identified JD, it is possible that had the police continued their investigation and found other witnesses, including Jadon Jones, to whom JD confessed the day after the shooting (*see* above), defendant might not have been charged with the deceased's murder.

**Trial Counsel's Failures**

According to defense appellate file, defendant gave JD's January 1991 letter from Florida to his trial attorney, but his attorney "never brought it up in court." (Def. appellate file at 504-05) A notation in the file corroborates that counsel had the letter, and that counsel sent defendant's appellate attorney a copy of the letter and said that JD was in Florida and "wouldn't implicate himself." (*id.*) CRU has not found any evidence that counsel asked the court to assign an investigator to interview JD—or even confirm that he was connected to the Jacksonville address on the envelope and thus likely wrote the letter (as CRU did during its investigation).

CRU believes that had counsel investigated JD's letter before trial (in February 1992), he would have at least discovered what the defendant's appeals investigator discovered in 1996 (and CRU confirmed)—that JD, in fact, wrote the letter. This would have called into question defendant's guilt, even without an admission of guilt from JD.

---

[62] Raymond S Nickerson, *Confirmation Bias: Ubiquitous Phenomenon in Many Guises*, 2 Rev. Gen. Psychol. 175, 175-76 (1998).

[63] Keith A. Findley, "Tunnel Vision," *Conviction of the Innocent: Lessons From Psychological Research*, ed. Bryan Cutler (APA Press, 2010); *see also* Keith A. Findley and Michael S. Scott, *The Multiple Dimensions of Tunnel Vision in Criminal Cases*, 2006 Wis. Law Review 291-340.

[64] Blackman was either mistaken, or he might have harbored a grudge against defendant, based on an altercation they had a few years prior to the shooting, as he stated in a prior proceeding.

Similarly, there is utterly no evidence in any file that counsel discussed or showed the letter to the prosecution. Had counsel done so, it would have afforded the prosecution an opportunity to investigate and reassess the validity of going forward with this murder prosecution.

**In Hindsight, Based on the New Evidence CRU Discovered, Defendant's Plea of Guilty to Manslaughter Was Not Warranted**

In 2009, the People, in good faith, offered defendant a plea of guilty to first-degree manslaughter and a resentence that resulted in his immediate release from prison. The 440 hearing ADA told CRU that he would not have asked for a guilty plea if they thought defendant was innocent. He accepted that JD shot the deceased and defendant acted in concert with JD in that defendant confronted the deceased with a gun during the shooting.

As set forth above, CRU has since interviewed JD and determined that he credibly confessed, and that he acted alone. The witnesses interviewed by the police—if anything—corroborate this conclusion (*see* above, Inadequate Police Investigation), and none of the myriad witnesses CRU interviewed undermine it. That numerous witnesses to a chaotic incident provided inconsistent accounts is not remarkable. Notably, most of the witnesses, while differing on some details, maintained that defendant was not the shooter and/or claimed that JD was the shooter.

The record demonstrates that defendant's acceptance of the plea offer was not an easy decision for him. His attorney did not want him to accept the plea, and he apparently had extensive discussions about it with his mother and family, who were present during the proceedings. CRU believes that if defendant was guilty, he would have readily accepted the offer without hesitation. The opportunity not to return to prison, for a crime he apparently did not commit, clearly outweighed his reservations about falsely allocuting to manslaughter.

**CONCLUSION**

It is clear there was no error or misconduct on the part of prosecution or the court. Nevertheless, defendant's plea of guilty was invalid. JD credibly confessed to CRU that he, and not the defendant, shot and killed the deceased, and that he acted alone. Accordingly, CRU, the Independent Review Panel, and KCDA agree that defendant's manslaughter conviction should be vacated, and the indictment dismissed.